UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TEBOGO PHIRI,

                  Plaintiff,

    - against -

RBC CAPITAL MARKETS, LLC,

                  Defendant,

      -and-

ROYAL BANK OF CANADA,

                Intervenor.

Case Nos. 17-cv-01661-RJS

**PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE AND OPPOSTION TO RBC'S REQUEST TO VACATE AND IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO CONFIRM**

Mitchell S. Cohen
Todd A. Gutfleisch
Debora A. Pitman
*Attorneys for Petitioner Tebogo Phiri*
17 State Street – 7th Floor
New York, New York 10004
Tel.:  212-847-7900

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ...................................................................................... 1

PERTINENT PROCEDURAL HISTORY AND FACTS ............................................... 4

ARGUMENT ................................................................................................................ 15

    I.   The Arbitration Order Is Definite And This Court Should Confirm The Arbitration Order And Can Do So In Compliance With Fed. R. Civ. P. 65(D) As Necessary ...................... 15

    II.  The Arbitration Order Should Be Confirmed And Bind RBC .......................................... 19

    III. The Panel Did Not Exceed Its Authority By Ruling On The Evidence The Parties Proffered ............................................................................................................................ 21

        A.   In Issuing The Arbitration Order, The Panel Acted Within Its Authority Based On The Evidence Adduced At The Hearing .............................................................. 21

        B.   The Arbitration Order Is Consistent With The Law And Was Not Made In Manifest Disregard Of The Law .......................................................................... 23

    IV. RBC's Arguments Against Applying Estoppel Disregard Its Conduct and Fail .............. 26

    V.  Royal Bank Has Not Established That It Owns The SAIP Or Established Its Entitlement To A Declaratory Judgment .................................................................................................. 28

CONCLUSION ............................................................................................................. 29

## TABLE OF AUTHORITIES

### FEDERAL

*AGCO Corp. v. Anglin*, 216 F.3d 589 (7th Cir. 2000)..................................................27

*Akhenaten v. Najee, LLC*, 544 F.Supp.2d 320 (S.D.N.Y. 2008) ...................................20

*Am. Ins. Co. v. Seagull Compania Naviera, S.A.*, 774 F.2d 64 (2d Cir. 1985).............17

*American Centennial Insur. Co. v. Arion Insur., Co. Ltd.,* No. 88 Civ. 1665, 1990 WL 52295, 1990 U.S. Dist. LEXIS 4209 (S.D.N.Y. Apr. 13, 1990)................................................17

*Bell Aerospace Co. Div. of Textron Inc., v. Local 516 Int'l Union Auto., Aerospace & Agr. Implement Workers of AM. (UAW)*, 500 F.2d 921 (2d Cir. 1974)................................15

*Blue Tee Corp. v. Koehring Co.*, 808 F. Supp. 343, 347 (S.D.N.Y. 1992), *aff'd,* 999 F.2d 633 (2d Cir. 1993) ..............................................................................................................17

*City of New York v. Mickalis Pawn Shop, LLC,* 645 F. 3d 114 (2d Cir. 2011) ............17

*Cook Industries, Inc. v. C. Itoh & Co. (America), Inc.*, 449 F.2d 106 (2d Cir. 1971), *cert. denied,* 405 U.S. 921 (1972)..................................................................................................3

*CRT Capital Grp. v. SLS Capital, S.A.*, 63 F. Supp. 3d 367 (S.D.N.Y. 2014) ............27

*D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95 (2d Cir. 2006)..........................................4

*Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108 (2d Cir. 1980) ..........................15

*DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818 (2d Cir. 1997)...........................21

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384 (2d Cir. 2005) ..................28

*Duffield v. Robertson Stephens & Co.,* 144 F.3d 1182 (9th Cir. Cal. 1998) rev'd on other grounds, 303 F.3d 994 (9th Cir. 2002) ..........................................................................................2

*Federal Commerce and Navigation Co. v. Kanematsu-Gosho, Ltd.*, 457 F.2d 387 (2d Cir. 1972)..............................................................................................................18

*FIAT S.p.A. v. Ministry of Finance & Panning*, No. 88 Civ. 6639, 1989 WL 122891, 1989 U.S. Dist. LEXIS 11995 (S.D.N.Y. Oct. 12, 1989) .............................................................22

*Fischer v. CGA Computer Associates, Inc.,* 612 F. Supp. 1038 (S.D.N.Y. 1985).........18

*Flender Corp. v. Techna-Quip Co.,* 953 F.2d 273 (7th Cir. 1992)................................17

*Golub v. Kidder, Peobody & Co.*, No. 89 Civ. 5903, 2000 WL 1024688, 2000 U.S. Dist. LEXIS 10268 (S.D.N.Y. July 24, 2000) .................................................................................................27

*H&H Acquisition Corp. v. Fin. Intranet Holdings, Inc.*, 669 F. Supp. 2d 351 (S.D.N.Y. 2009) ................................................................................................................................25

*Hall Street Associates, LLC v. Mattel, Inc.*, 552 U.S. 576 (2008) .................................................23

*Hartford Fir. Ins. Co. v. The Evergreen Org., Inc.*, No. 1:07-cv-7977 2008, WL 4185731, 2008 U.S. Dist. LEXIS 69301 (S.D.N.Y. Aug. 28, 2008)....................................................................... 15

*Hendricks v. Feldman Law Firm LLP*, No. 14-CV-826, 2015 U.S. Dist. LEXIS 129001, 2015 WL 5671741 (D. Del. Sept. 21, 2015)............................................................................................23

*In re Global Reinsurance Corp. v. Yasuda Fire & Marine Ins. Co.*, 1999 US Dist. LEXIS 11480 (S.D.N.Y. July 28, 1999) ..............................................................................................................17

*In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2007 WL 2994395, 2007 U.S. Dist. LEXIS 76272 (S.D.N.Y. Oct. 16, 2007) ...................................................................................................18

*Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64 (1967)......................................................................................................................16

*Jock v. Sterling Jeweler Inc.*, 646 F.3d 113 (2d Cir. 2011) ..........................................................24

*Kalyanaram v. New York Inst. of Tech.*, 549 Fed. Appx. 11 (2d Cir. 2013)..................................20

*MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC*, 268 F.3d 58 (2d Cir. 2001).......23

*McSherry v. Giannuzzi*, 717 F. Supp. 238 (S.D.N.Y. 1989).........................................................26

*New York City Dist. Council of Carpenters v. Gotham Installations, Inc.*, No. 13 Civ. 5659 (RJS) 2013 WL 5943986, 2013 U.S. Dist. LEXIS 159057 (S.D.N.Y. Oct. 25, 2013)............................4

*Opals on Ice Lingerie, Designs by Bernadette Inc. v. Bodylines Inc.*, 320 F.3d 362 (2d Cir. 2003).................................................................................................................27

*Orion Shipping & Trading Co. v. Eastern Petroleum Corp.*, 312 F.2d 299 (2d Cir. 1963)..........22

*R.G. Group, Inc. Horn & Hardart Co.*, 751 F.2d 69 (2d Cir. 1984) .............................................26

*Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295 (2d Cir. 1996) .............................................27

*RGA Reinsurance Co. v. Ulico Cas. Co.*, 355 F.3d 1136 (8th Cir. 2004) .....................................16

*Rich v. Spartis*, 516 F.3d 75 (2d Cir. 2008) .................................................................................17

*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174 (2d Cir. 1998) ...............15

*Santos-Busch v. Fin. Indus. Regulatory Auth. Inc.,* 591 Fed Appx. 32 (2d Cir. N.Y. 2015)...........2

*Schaad v. Susquehanna Capital Group*, No. 03 Civ. 9902, 2004 U.S. Dist. LEXIS 15772, 2004 WL 1794481 (S.D.N.Y. Aug. 10, 2004)......................................................................................22

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662 (2010) ............................24

*Stolt-Nielsen SA v. AnimalFeeds Int'l Corp..* 548 F.3d 85 (2d Cir. 2008) ..................................26

*Synergy Gas Co. v. Sasso*, 853 F.2d 59 (2d Cir. 1988) ................................................................21

*Taylor v. Sturgell*, 553 U.S. 880 (2008)......................................................................................20

*The Amalgamated Sugar Co. LLC v. NL Indus., Inc.,* 825 F.2d 634 (2d Cir. 1987) ...................20

*Thomson-CSF, S.A. v. American Arbitration Association*, 64 F.3d 773 (2d Cir. 1995)...............28

*United States ex rel. Damuth Servs. v. W. Sur. Co.*, 368 Fed. Appx. 383 (2d Cir. 2010)............27

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593 (1960)........................16

*Viacom International Inc. v. Tandem Productions, Inc.,* 368 F. Supp. 1264 (S.D.N.Y. 1974)...................................................................................................................26

*Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200 (2d Cir. 2002)..................................3, 21

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ..........................................................................28

## STATE

*Furgang v. Epstein,* 106 A.D.2d 609 (2d Dep't 1984) .................................................................25

*Kowalchuk v. Stroup*, 61 A.D.3d 118 (1st Dep't 2009)................................................................25

## RULES

Fed. R. Civ. P. 60 (b)(2)................................................................................................................18

Fed. R. Civ. P. 65 (d) ....................................................................................................................19

Fed. R. Civ. P. 65 (d)(1)(C) ............................................................................................................1

Fed. R. Civ. P. 65 (d)(2)(C) ..........................................................................................................19

The Federal Arbitration Act, 9 U.S.C. §9 ..................................................15

The Federal Arbitration Act, 9 U.S.C. §10 ................................................19

The Federal Arbitration Act, 9 U.S.C. §11 ................................................19

The Federal Arbitration Act, 9 U.S.C. §13 ................................................16

The Federal Arbitration Act, 9 U.S.C. § 208 .............................................15

The Declaratory Judgment Act, 28 U.S.C. 2201(a) ...................................28

## PRELIMINARY STATEMENT

RBC Capital Markets, LLC ("RBC CM") and Royal Bank of Canada ("Royal Bank") (collectively, "RBC") have employed misstatements, concealments, and self-contradictions to delay being required to fulfill promises to and an agreement with Phiri to provide him the Statistical Arbitrage Intellectual Property and the unaudited track record (collectively, the "SAIP") he used, further developed, and revised in his nearly two decades of work for RBC. Despite RBC's efforts, it is obvious that RBC CM *lost* the framed issue FINRA arbitration and the arbitrators (the "Panel") unanimously "granted" Phiri a mandatory permanent injunction (the "Arbitration Order"), effective "immediately." This reflects the hearing evidence concerning the nature and use of the SAIP and RBC's written promise to Phiri to provide him the SAIP if he moved his family outside the United States to accommodate RBC and worked another year at a RBC affiliate. RBC CM lost on the merits because Phiri performed and all of RBC CM's contentions were belied by compelling testimonial and documentary evidence.

Now, RBC makes four baseless and self-contradictory arguments that the Arbitration Order cannot be confirmed. As to the first, "indefiniteness," to the contrary, the Arbitration Order is precise; Phiri's request for a permanent injunction was—over RBC opposition— "granted," to be effective "immediately." RBC's argument that the Panel acted in manifest disregard of the law by enforcing RBC's written promise to provide Phiri "IP specific to the Stat Arb business along with a right to the related track record (non-audited or affirmed)" contradicts its indefiniteness argument. Notwithstanding RBC's submissions, an arbitration panel is not bound by the Federal Rules of Civil Procedure. In confirming the Arbitration Order, this Court can fashion a Fed. R. Civ. P. 65 (d) (1)(C) compliant confirmation order. For example, State Supreme Court Justice Marcy S. Friedman in Her Honor's preservation orders defined the SAIP

and RBC declarant Jay Zhu described the SAIP as part of RBC's opposition submissions. Plus, the arbitral record is before this Court. In addition, upon receipt of the Arbitration Order, Phiri wrote RBC and provided the location of the SAIP as last known by him in repositories, directories, and servers. (Declaration of Patrick Shea, sworn to March 22, 2017, Ex. 10)

RBC's second contention, concerning "property rights of non-parties" is nakedly asserted without supporting legal citation and in disregard of the arbitral record. To the extent Royal Bank has an interest in the SAIP (and RBC has not yet made a suggestion about other "non-parties"), confirmation of an arbitral decision is not state action under the Fifth Amendment[1] as RBC seemingly suggests but never quite argues. Further, the question of Royal Bank's alleged ownership, something RBC *deliberately* kept from the Panel (Transcript of February 22, 2017 Proceedings in related action 17-Civ-1318 at p. 22, ll. 14-23 and Transcript of April 6, 2017 Proceedings in this action at p. 19, l. 12 – p. 13, l. 2), is only an internecine dispute between RBC CM and Royal Bank. RBC foresaw and addressed the risks created by its internal arrangements by having the two affiliates agree to mutual indemnification and alternative dispute provisions in their Amended Services Agreement (the "ASA"), dated as of the 12 day of August, 2015 and signed by RBC on September 29 and October 1, 2015. (Document No. 41-4, at ASA ¶¶ 8.1 and 13) If RBC CM exceeded its authority as Royal Bank's express and implied agent, notwithstanding that Royal Bank had actual written notice of the promises to and agreement with Phiri, that does not justify a declaratory judgment to abrogate the Arbitration Order. Further, this Court should not distinguish between these RBC affiliates when RBC CM is merely the means

---

[1] "FINRA is not a state actor that can be held to constitutional standards." *Santos-Busch v. Fin. Indus. Regulatory Auth. Inc.,* 591 Fed Appx. 32, 34 (2d Cir. N.Y. 2015); *Duffield v. Robertson Stephens & Co.,* 144 F.3d 1182, 1202 (9th Cir. Cal. 1998) ("neither private arbitration nor the judicial act of enforcing it under the FAA constitutes state action") rev'd on other grounds, 303 F.3d 994 (9th Cir. 2002).

by which Royal Bank engages in the securities industry in the United States.

RBC's third argument, about the arbitrators' powers, also is based on RBC's concealment from the Panel of Royal Bank's alleged interest in the SAIP. Counsel's April 18, 2017 Declaration about RBC CM's affirmative judicial assertion of ownership and precisely worded statement at ¶3 that "[t]hereafter, we further reviewed the ownership issue … [and] it was not until after the arbitration and the panel's decision that we obtained documents," is off-point. It does not matter when outside counsel receives documents, something different from a party's knowledge (or counsel's awareness of facts). What matters is that RBC relies on documents that RBC CM signed but RBC CM strategically did not raise lack of ownership in the arbitration to avoid the risk of Royal Bank being compelled to arbitrate. Moreover, Royal Bank had an in-house lawyer present at each arbitration session and he was designated as hearing co-counsel. (Document No. 41-9, Cohen Dec. in Opp. to Royal Bank's Intervention Motion at Ex. I; Arb. Tr., at p. 109, ll. 5-12, p. 2, 91, 401, 657, and 931.) He too remained mute and allowed the ongoing concealment leaving intact the prior judicial representation of RBC CM's ownership. Estoppel and *res judicata* bar RBC's collateral attacks. A party "cannot remain silent, raising no objection during the course of the arbitration proceeding, and when an award adverse to him has been handed down complain of a situation of which he had knowledge from the first . . . [s]ilence constitutes a waiver of the objection." *Cook Industries, Inc. v. C. Itoh & Co. (America), Inc.*, 449 F.2d 106, 107-108 (2d Cir. 1971), *cert. denied*, 405 U.S. 921 (1972).

RBC's fourth argument alleging "manifest disregard" of the law by the Panel tests the nadir of good faith advocacy. An "arbitrator's factual findings and contractual interpretation are not subject to judicial challenge, particularly on [the] limited review of whether the arbitrator manifestly disregarded the law." *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 214

(2d Cir. 2002). As this Court has written, "the arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." *New York City Dist. Council of Carpenters v. Gotham Installations, Inc.,* No. 13 Civ. 5659 (RJS) 2013 WL 5943986, 2013 U.S. Dist. LEXIS 159057 at * 4 (S.D.N.Y. Oct. 25, 2013), citing *D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 110 (2d Cir. 2006). Here, the Court need only look to the May 28 to June 1, 2015 email exchange between Phiri and RBC CM executive Bruce Macdonald ("Macdonald") in which Macdonald makes RBC CM's offer to Phiri, stating "[i]n addition, should this right [concerning deferred compensation, severance, and death insurance] be exercised after one year of employment in the Bahamas or if you are dismissed without cause, you will also be afforded IP specific to the Stat Arb business along with a right to the related track record (non-audited or affirmed)" and Macdonald's later confirmation of an agreement writing Phiri  "We got to green." (Arb. Ex. 51)

## PERTINENT PROCEDURAL HISTORY AND FACTS

On December 12, 2016, Phiri simultaneously initiated a FINRA arbitration against RBC CM to obtain a copy of the SAIP and a special proceeding in New York Supreme Court to require RBC CM to maintain, safeguard, and not modify or alter a copy of the SAIP. RBC CM's December 15, 2016 written opposition to Phiri's application did not merely assert ownership of the SAIP, RBC CM wrote: "[e]ven if [Phiri] were ultimately successful on his claims, Phiri's use of the intellectual property would not prohibit RBC [CM]—its undisputed owner from selling, transferring or licensing it to others." (Cohen Mar. 10, 2017  Dec.,[2] Ex. H and Gutfleisch Dec., Ex. H at pp.4-5) Over RBC CM's objection, State Supreme Court Justice Marcy S. Friedman issued a temporary restraining order (the "TRO") directing that RBC CM, "its agents, and all

---

[2] The Cohen Mar. 10 Dec. is attached to the Todd A. Gutfleisch Dec. sworn to on April 11, 2017 as Exhibit D.

others acting under or with it, are:

> (1) ordered to preserve a copy of the Statistical Arbitrage Intellectual Property and the    unaudited performance track record of strategies managed by petitioner (the Property), as    defined in a letter dated February 9, 2015 to Tebogo Phiri on RBC Capital Markets    letterhead, annexed as Exhibit E to the Verified Petition; and

> (2) enjoined and restrained from destroying, altering, erasing, deleting, removing, or    modifying the aforesaid copy of the Property."

On January 19, 2017, RBC's counsel stipulated to convert the TRO into a preliminary injunction without objection to Justice Friedman's definition or making a suggestion of indefiniteness. Nor did RBC CM suggest, as it has now, its obligation was only to preserve evidence. (RBC's April 18, 2017 Memorandum To Vacate, p. 2.) Instead, the TRO's wording and stipulated preliminary injunction requires that a copy of the SAIP be preserved without alteration.

In Phiri's Statement of Claim (Shea Mar. 22, 2017 Dec. at Ex. 1), he alleged in part:

> 1. Phiri ran a statistical arbitrage trading group (the "StatArb Team") for Respondent RBC Capital Markets, LLC (CRD #31194) ("RBC LLC"). Historically, the StatArb Team generated more than $50 million in annual trading revenue to RBC LLC.

> 2. Following the financial disruptions in 2008, American federal regulators began to phase safe-guards into the United States financial markets including the "Volcker Rule," which placed severe restrictions on banks engaging in proprietary trading, *i.e.*, using  capital to engage in trading that placed inherent risk on the bank. Phiri's statistical arbitrage group engaged in just the type of proprietary trading the Volcker Rule barred for United States banks.

> 3. Notwithstanding the Volcker Rule, RBC LLC and certain of its affiliates that operated together as "RBC Capital Markets" ("RBC") wanted to continue to reap the financial benefits of the profitable trading activity of Phiri and the StatArb Team, as well as the larger Quantitative Trading Team (the "Quant Team") which included the StatArb Team.

> 4. RBC conceived a plan in around 2014 to transfer Phiri and certain members of the Quant Team, including the StatArb Team, to Toronto or the Bahamas to continue trading (the "Offshore Plan").

> 5. Phiri had worked with RBC's inside and outside counsel and he

doubted the Offshore Plan, especially it being sustainable in the medium to long-term. Instead, Phiri expected that there would be practical business difficulties and regulatory issues created by the Offshore Plan and he was rightfully concerned that RBC would decide to change course after he moved with his family at RBC's request and devoted his time to a venture where he questioned its medium to long term viability.

6. While Phiri did not want to see his long RBC employment end, he also did not want to move his wife and then seven year old son from New York City unnecessarily or have to move them again in the short term.

7. Phiri recognized that if RBC did not remain committed to its Offshore Plan for the medium to long term, he would have wasted significant time that he could have instead devoted to developing different intellectual property, the lifeblood of his career in profitable statistical arbitrage trading. Phiri told RBC his concerns. Phiri explained to management that he would move only if RBC agreed to provide to Phiri the statistical arbitrage intellectual property and unaudited track record of strategies that Phiri managed (collectively, the "SAIP") for years,[3] in addition to an ordinary severance package, if the RBC's Offshore Plan did not work out and Phiri left RBC's employment. Phiri wanted the SAIP

---

[3] "The SAIP is defined in a June 9, 2015 Transfer Agreement document between Phiri and RBC as:

> inventions and/or discoveries that are exclusively owned by RBC relating to U.S. statistical arbitrage activities (including the unaudited performance track record of strategies that [Phiri] manage[d]) that: (a) [have been] developed, conceived or reduced to practice (alone or jointly with others) by [Phiri] or others on [his] team while employed with, or in connection with the provision of services to or on behalf of, any RBC entity, whether or not conceived or developed during working hours, (b) result from any work performed by [Phiri] or other members of [his] team on behalf of any RBC entity of from the use of any RBC entity's time, material, employees, proprietary information, property or facilities, whether or not [Phiri] or others participated in their development, conception or reduction to practice, or (c) result from the use of any RBC entity's time, material, employees, proprietary information, property or facilities in their development, conception or reduction to practice by [Phiri] or others on [his] team, whether or not Phiri or others were then employed by any RBC entity. For the avoidance of any doubt, Statistical Arbitrage Intellectual Property shall not include RBC inventions or discoveries that are within the public domain or pass into the public domain due to no fault of [Phiri's]."

(Footnote in the original.)

to offset, at least partially, his lost time devoted to RBC's Offshore Plan.

8.  Phiri and his then manager, Eric Tavel ("Tavel"), started to negotiate Phiri's possible transfer in fall 2014.  In the spring, 2015, RBC decided to move the StatArb Team to the Bahamas and have them become employees of RBC Barbados Trading Bank Corporation, referred to by RBC as "RBTB Bahamas Branch."

9.  For Phiri to move to the Bahamas, he made RBC providing to him the SAIP if the Offshore Plan proved ineffectual or not sustainable a condition of his moving.

10. For months, RBC LLC and RBC's senior management would not agree to Phiri's condition, and Phiri was equally steadfast that he was not moving to the Bahamas unless RBC agreed.  A stand-off ensued.

11. On June 1, 2015, RBC LLC and RBC agreed to Phiri's condition. Bruce MacDonald ("MacDonald"), Head of Discretionary Capital Group, wrote Phiri that RBC agreed to give Phiri an "option" that "**after one year of employment in the Bahamas or if you are dismissed prior without cause, you will also be afforded IP specific to the Stat Arb business along with a right to the related track record (non-audited or affirmed)**."

12. Reflecting the agreement reached between Phiri, on the one hand, and RBC LLC and RBC, on the other, RBC revised a draft of a previously proffered relocation employment offer letter on the letterhead of both RBC and RBTB Bahamas Branch to Phiri, which memorialized certain consideration for Phiri moving to the Bahamas, such as relocation expenses, tax treatment of compensation, housing, and other benefits and, as revised, reiterated RBC LLC's agreement to Phiri's condition for moving to the Bahamas.

\*\*\*

14. With RBC LLC's written commitment, its reiteration by RBC, and in reliance upon the promises made to him, Phiri flew to the Bahamas the next day and, as RBC had asked, Phiri ran the StatArb and Quant Macro Team from the Bahamas (collectively, the "Bahamas Quant Team").

\*\*\*

45. At the end of May, RBC LLC's Executive Committee reversed course and agreed to Phiri's condition for him to move to the Bahamas.  On May 28 or 29, 2015, MacDonald sent Phiri an email entitled "Agreement" that specified "should this right be exercised after one year in the Bahamas or if you are dismissed prior without cause, you will also be afforded IP specific to the Stat Arb business along with a right to the related track record (non-audited or affirmed)." … on June 1, 2015, MacDonald reaffirmed that an agreement had

been reached confirming to Phiri "[w]e got to green." A copy of this email is annexed hereto as Exhibit D.

***

49. After the parties agreed to the materials terms, Phiri fully performed his obligations. Although the parties had made an enforceable agreement about the SAIP and Phiri's compensation, they continued to exchange correspondence and drafts of a more formal document, the relocation employment offer letter on the letterhead of both RBC and RBTB Bahamas Branch.

(Emphasis added.)

At the arbitration's initial session, on January 4, 2017, RBC CM accepted the Panel's composition without objection (Arb. Tr., p. 11), resisted discovery sought by Phiri, and argued that testimony and the submission of evidence should begin. (Arb. Tr., p. 32-38, l. 7)[4] RBC CM asserted that its counsel had already "dug into the evidence in this case." (Arb. Tr., p. 29) The Panel ruled, however, to "have the permanent injunction hearings in the beginning of February and have limited discovery between now and then." (Arb. Tr., p. 63, ll. 19-23) Thus, contrary to RBC's contention, the Panel afforded the parties ample time under FINRA Rule 13804, requiring twenty days before the hearing, to request a reasoned award but RBC CM never did. As to the SAIP, RBC CM stated: "we're still using that intellectual property to generate revenue for the bank. There was never any dispute about that." (Arb. Tr., p. 27, ll. 14-17)

Also during the initial January 4, 2017 arbitration session, Phiri explained that Justice Friedman's TRO "was a litigation hold" but in the arbitration Phiri sought "permanent injunctive relief in the nature of specific performance" (Arb. Tr., p. 43, ll. 16-21) and that Phiri sought "affirmative injunctive relief telling RBC to give us [sic] the statistical arbitrage intellectual property to Mr. Phiri to use on a nonexclusive basis." (Arb. Tr., p. 45, l. 13-20) This reflected the Statement of Claim's request for a "permanent injunction providing Phiri the SAIP for use

---

[4] The transcript has an error in identifying counsel for Phiri, Mr. Cohen, as the speaker when it is RBC CM's counsel, Mr. Shea.

8

outside his RBC [CM] employment."

In RBC CM's opening on January 30, 2017, it emphasized that "[i]f you've looked at the claim, the claim is that Mr. Phiri would to have a nonexclusive copy of intellectual property" (Arb. Tr., p.141, ll. 22-25) and that the SAIP had a "limited capacity" meaning that if Phiri and RBC CM simultaneously had the SAIP, it would be less valuable. (Arb. Tr., p. 142-143) Counsel stated that the SAIP is "something even Mr. Phiri recognized, is the exclusive intellectual property of the bank" without distinguishing among RBC CM, the arbitration respondent, and any other RBC entity. (Arb. Tr., p. 143)

Phiri called as his first witness RBC's Macdonald, a senior executive who once sat as a Royal Bank Executive Officer (Arb. Tr., p. 166, l. 16 – p. 169). Macdonald promised Phiri the SAIP in exchange for Phiri working another year for RBC but in the Bahamas because of the implementation of the Volcker Rule as to banks in the United States. (Arb. Tr., p, 184, ll. 15-21, Arb. Ex. 51) Contrary to RBC CM's defense, as pleaded in its Answer (Cohen Mar. 10, 2017 Dec., Ex. B) and argued in its opening and summation (Arb. Tr., p. 160, ll. 32-20 and p. 1163, ll. 11-15), that any deal Phiri had made was only with RBC's Bahamas affiliate, "RBTB," RBC CM designated Macdonald as its party representative to be present for opening statements (Arb. Tr., p. 108, ll. 21-24), in addition to the in-house Royal Bank lawyer that attended every hearing session (Arb. Tr., p. 2, p. 108, ll. 21-24, p. 109 ll. 5-12, p. 91, 401, 657, and 931). When Macdonald had emailed Phiri, promising the "IP specific to the Stat Arb business along with a right to the related track record (non-audited or affirmed)," he was registered with FINRA as a RBC CM executive. (Arb. Ex. 2)

The hearing evidence included that after Phiri had worked over a year in the Bahamas, he emailed to Macdonald (Arb. Ex. 109) asking, in Macdonald's words, whether RBC CM would

"recognize" what Phiri believed he was "due on intellectual property." (Arb. Tr., p. 214, l. 24 –
p. 215, l. 3). Macdonald forwarded the email to his colleagues on the Operating Committee for
Royal Bank's Capital Markets division (Arb. Tr., p. 166, l. 16 – p. 168, l. 5), including RBC CM
and Royal Bank, explaining that Phiri "appears to have a catalog of meetings, discussion points,
and representations made to him prior to and as part of coming to the Bahamas." (Arb. Ex. 110)
When asked by Phiri's counsel, Macdonald testified that by a catalogue he meant:

> a ledger, a record, a calendar of all this stuff that came out in your opening. Met
> with Doug McGregor on this day, made this agreement on this day, so I'm saying
> this guy is armed for bear knowing full well and having documented and recorded
> all of the events through the chronology of time that he thought were relevant.

(Arb. Tr., p. 215, ll. 14-21). Macdonald put special emphasis on verbal representations from
Royal Bank Executive Officer McGregor, including McGregor's handshake with Phiri (Arb. Tr.,
p. 868, ll. 6-13), and another Capital Markets Operating Committee member, Michael Bowick,
while admitting he was not present for those discussions. (Arb. Tr., p. 215, l. 24 – p. 216, l. 13)
As to Macdonald's email to Phiri confirming that the parties had "got to green" specifically
about the written promise to Phiri that he "will also be afforded IP specific to the Stat Arb
business along with a right to the related track record (non-audited or affirmed)" and his
colleagues reaction when Phiri asked for the SAIP about fifteen months later, Macdonald
testified about:

- "it festered for a bit and I was writing this with the goal of okay, smart people, you got us here, how do you want to deal with this,"

- Bowick questioning what agreement and criticizing Macdonald for his email to Phiri;

- Bowick denying a memory of being copied on the email agreement with Phiri when it was made and Bowick offering "the classic I get a million e-mails, did I ever see this;" and

- being blamed for this, "for the business not working. I was getting blamed for everything that had my name on it."

(Arb. Tr., p. 216, l. 16 – p. 217, ll. 19 - 23)   Macdonald amplified that he felt it was important

that Bowick:

> realize[] that this wasn't something he was going to get to blame other people on;
> that it had gone to him and the framework had been blessed by him because I
> worry from time to time on the –revision is stock. Alternate facts.

(Arb. Tr., p. 227, l. 21 – p. 228, l. 7).

In addition to Justice Friedman's definition of the SAIP, to which RBC CM agreed when

stipulating to have the TRO converted into a preliminary injunction, there was compelling

arbitration hearing evidence of precisely what had been promised to Phiri and:

> the evidence overwhelmingly proved to the Panel that RBC CM specifically
> understood what constituted the SAIP. For example, Phiri's testimony described
> the SAIP and its repositories during his RBC CM employment.[5] Macdonald too
> described the SAIP in detail,[6] even acknowledging that he "cut and pasted"
> Phiri's narrative description and provided it to a RBC CM colleague.[7]

(Gutfleisch Dec., Ex. D, Cohen Dec., dated March 10, 2017, at ¶22.)  Phiri's hearing testimony

corroborated his Statement of Claim definition (Arb. Tr., p. 547, l. 21 to p. 548, l. 18, p. 549, l.

15 to p. 551, l. 14 ) used in Phiri's post Arbitration Order correspondence (Shea Mar. 22, 2017

Dec., Ex. 10) that identified the last known to Phiri repositories, directories, and servers for the

SAIP.

The SAIP definition that Macdonald "cut and pasted" to give to his colleagues in

response to the question "[w]hat does his IP mean," stated:

---

[5] Arb. Tr., p. 547, l. 21 to p. 548, l. 18, p. 549, l. 15 to p. 551, l. 14 and Arb. Ex. 134 at Bates-stamp p. 238.

[6] Arb. Tr., p. 282, l. 15 to p. 284, l. 25, p. 298, l. 6 to p. 299, l. 12, p. 426, l. 5 to 21, and Arb. Exs. 20, 29, 30, 46.

[7] Arb. Tr., p. 378, ll. 21-25.

Copy of Quant Trading intellectual property and its implementation (Stat Arb and impacted strategies to Tebogo and Quant Macro and impacted strategies to Eric). Intellectual property and its implementation are defined as software representation and transferable data [] that is developed and managed by members of the Quant team. This software and data are stored in repositories, directories and servers that are exclusively controlled for use by the Quant trading team. The software primarily comprises Quant Trading research plant for and production implementation. For avoidance of doubt, intellectual property and implementation does not include software developed outside of the Quant Trading tem (eg. RBC trading execution and inventory systems.)

(Arb. Ex. 48) As to the pictorial representation of the SAIP (Arb. Ex. 29), Macdonald testified: "[t]his was meant to be sort of a picture is worth  a thousand words extraction of what is the intellectual property  as it pertains to the quantitative or the statistical arb system." (Arb. Tr., p. 298, l. 6 – 8)   The hearing evidence included Macdonald's email to his senior colleagues about his checking with Brad Beutter[8] and Beutter's calculation that giving Phiri the SAIP after Phiri spent a year working off-shore for a RBC affiliate made economic sense. (Arb. Ex. 49, Arb. Tr., p. 286 l. 8 - p. 288, l. 24)

To attempt to obscure the clarity of evidence submitted to the Panel about what is the SAIP, RBC refers to draft immigration letters for Phiri's offshore transfer from New York and attempts to change the historical time-line. The hearing evidence, however, proved that RBC provided Phiri the first draft in February 2015. (Arb. Ex. 15) The parties were then far apart. Phiri steadfastly refused to leave the United States and RBC CM rejected his request to be provided the SAIP as consideration for doing so. (Arb. Exs. 22, (April 21, 2015 email from Michael Bowick to Helena Pagano at 3:22 a.m.) (We keep pushing back and he keeps pushing for us some sort of agreement") and 34 "I have waited long enough for an answer from Tebes [Phiri]. We need to start shutting down positions.") The Phiri testimony that RBC cites refers to

---

[8] Mr. Beutter along with Richard Tavoso brought the statistical arbitrage business to RBC CM. (See their declarations at Document Nos. 25-5 and 25-6)

conversations several months before the May 28 - June 1, 2015 email exchange confirming an agreement.

Mcdonald also testified to the difficulty he encountered internally at RBC in attempting to have the draft immigration letter completed. He described one RBC lawyer as having "pooched the assignment" (Arb. Tr., p., 212, l.16 – p. 213, l. 11), he at times delayed the finalization of the transfer letter (Arb. Tr. , p. l. 4 – p. 245, l. 24), but he understood that Phiri would not leave the United States absent RBC CM's agreement to provide him the SAIP. (Arb. Tr., p. 247, l. 24). Phiri too testified about how the drafts did not capture the agreement made. (Arb. Tr., p. 674, l. 16 – p. 16, l. 24) and even on cross-examination, Phiri explained that as the drafts were revised, he pressed for finalization of the drafts (Arb. Tr., p. 707, l. 14 – p. 708, l. 7) but unequivocally testified that the parties had agreed that Phiri would receive what Macdonald promised him in writing. (Arb. Tr. p. 831, l. 18 – p. 834, l. 19)

Macdonald also testified that Jay Zhu ("Zhu") replaced Phiri but moved to Toronto to do so. (Arb. Tr., p. 178, l. 8 to p. 179, l. 9, p. 185, l. 16 – p. 187, l. 10,  203, l. 16 – p. 205, l. 14). RBC has submitted the Jay Zhu declaration, dated February 21, 2017, demonstrating its knowledge of what the Arbitration Order requires to be provided *i.e.*, "[t]he IP includes strategies, analytical models and concepts relating to statistical arbitrage, many of which are embodied in computer code derived from historical data to identify when to buy or sell certain securities."[9] As to Zhu's argument that if a third party obtains "a copy of any of these strategies" causing irreparable harm, he apparently does not know that has already happened. (see Docket

---

[9] Zhu's declaration does not state that he works for RBC CM. Instead, he is a "Director and Head of Quant Trading with RBC Dominion Securities Ltd." To date, RBC has not offered any evidence of a Dominion license but, in any event, Zhu describes the SAIP except for Phiri's unaudited track record in paragraph 2 of his Declaration.

Nos. 38-4; Cohen Dec. In Opposition to Royal Bank's intervention motion at Exhibit J, the "IP Agreement," and Declaration of Richard Tavoso, sworn to April 24, 2017, submitted as Ex. L to the Gutfleisch Reply Dec. sworn to April 25, 2017).[10]

RBC's repeated accusation that Phiri's summation suggested the Panel pierce Royal Bank's corporate veil ignores that RBC CM summed up first and asked for an award in Royal Bank's favor. (Arb. Tr., p. 1166, ll. 4 - 6) While Phiri's efforts to obtain confirmation has been pending, the Panel has been informed about Royal Bank's ownership contention and RBC's effort to vacate the Arbitration Order.

On April 6, 2017, the Court stated to RBC: "it seems to me, [RBC] deliberately took steps that would delay this, that would drag this out for months. Well done. You've achieved, I guess, the goal ..." (Document No. 41-7, Trans. of Proceedings at p. 43) Given the Court's expressed view, RBC submits counsel's Declaration about when counsel received documents now relied upon by RBC. Counsel does not, however, recant the February 22 and April 6, 2017 statements that Royal Bank's alleged interest in the SAIP was not disclosed "advisably" and acknowledgement of deliberate conduct to avoid having the Panel hold Royal Bank liable and/or Phiri attempting to compel Royal Bank to arbitrate. It is undisputed that RBC did not provide the Panel the documents it now relies upon to argue Royal Bank's interest in the SAIP. These documents are not evidence, however, that Royal Bank owned the SAIP when it was promised to Phiri. The ASA post-dates the May 28 - June 1, 2015 email exchange and agreement between Phiri and RBC. (Document No. 41-5) The ASA's Schedule, however, makes RBC CM an express agent of Royal Bank, in addition to RBC CM being an implied agent. (Document No.

---

[10] Any RBC argument that the IP agreement with another former RBC CM employee specifies certain portions of the SAIP disregards that what Macdonald promised on behalf of RBC CM was "IP specific to stat Arb business along with a right to the related track record" (non audited or affirmed). In short, the SAIP in its entirety including the unaudited track record.

41-6, Schedule ¶ G)

## ARGUMENT

I.  **THE ARBITRATION ORDER IS DEFINITE AND THIS COURT SHOULD CONFIRM THE ARBITRATION ORDER AND CAN DO SO IN COMPLIANCE WITH FED. R. CIV. P. 65(D) AS NECESSARY**

Phiri asked the Panel for a permanent injunction requiring RBC CM to provide him with

a copy of the SAIP. The Arbitration Order "granted" Phiri's request, unambiguously, and stated

that it was effective "immediately." There is nothing indefinite about the Arbitration Order. The

Federal Arbitration Act ("FAA"), 9 U.S.C. §9, requires that "the court must grant such an order

unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11."[11] RBC

complains that under 9 US.C. §10(a)(4), the Arbitration Order is not "a 'mutual, final, and

definite award'."[12] As a matter of fact and law, RBC is wrong. The Second Circuit has described

an arbitral award that is "final and definite" as one that "resolves all issues submitted to

arbitration . . . definitively enough so that the rights and obligations of the two parties, *with

respect to the issues submitted*, do not stand in need of further adjudication." *Rocket Jewelry

Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 176 (2d Cir. 1998). The Arbitration Order

---

[11] As discussed in Phiri's March 10, 2017 Memorandum of Law in Support of Confirmation at pp. 3 - 4, this proceeding is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 201 U.S.T. 2517 (the "New York Convention"). Chapter two of the FAA implements the New York Convention. 9 U.S.C. § 208, captioned "residual application" provides that "Chapter 1 [9 USC §§1 et seq.] applies to actions and proceedings brought under this chapter [9 USC §§ 201 et seq.] to the extent that chapter is not in conflict with this chapter [9 USC §§ 201 et seq.] or the Convention as ratified by the United States."

[12] RBC cites three cases in support of *vacatur, Bell Aerospace Co. Div. of Textron Inc., v. Local 516 Int'l Union Auto., Aerospace & Agr. Implement Workers of AM. (UAW)*, 500 F.2d 921 (2d Cir. 1974), *Hartford Fir. Ins. Co. v. The Evergreen Org., Inc.*, DKT No. 1:07-cv-7977 2008 WL 4185731, 2008 US Dist LEXIS 69301, S.D.N.Y. Aug. 28, 2008), and *Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108 (2d Cir. 1980). The arbitral awards in each of these cases were remanded to the respective arbitral panels for clarification. Not one resulted in an arbitral award being vacated.

unequivocally granted Phiri the injunctive relief that he sought and required RBC to afford him the SAIP. RBC's argument that it does not know what the Arbitration Order requires is belied by Justice Friedman's Orders, Jay Zhu's Declaration, the SAIP's identification in the arbitration Statement of Claim, and the uncontested plethora of evidence about what constitutes the SAIP during the hearing. As concisely stated by Macdonald in writing to Phiri, what the Panel granted is Phiri's request for "IP specific to the Stat Arb business along with a right to the related track record (non-audited or affirmed)," i.e., the SAIP.

Zhu's Declaration demonstrates that even Royal Bank understood what the Panel awarded when Royal Bank unsuccessfully sought to restrain Phiri from enforcing the Arbitration Order. RBC ignores that "[a]rbitrators have no obligation to the court to give their reasons for an award" (and especially when RBC CM did not take the opportunity to request a reasoned award as provided by FINRA Rules). *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598 (1960).

RBC's argument that the Panel needed to comply with Fed. R. Civ. P. 65(d) ("Rule 65(d)") suffers from two flaws: (i) RBC CM never raised that issue in the arbitration; and (ii) it has no basis in law. Moreover, this Court can easily avoid the result in *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64 (1967), by crafting a confirmation order that explicitly states what RBC is required to do. In *RGA Reinsurance Co. v. Ulico Cas. Co.*, 355 F.3d 1136, 1139 (8th Cir. 2004), the Eighth Circuit stated that under 9 U.S.C. § 9 "a court may confirm an award by crafting specific relief 'consistent with the intent of the arbitrators'." This is particularly important here because Phiri requests a judgment confirming the Arbitration Order with "the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action." 9 U.S.C. §13.

16

"In considering a petition to confirm or vacate an arbitral award, a district court typically has at its disposal the full evidentiary record from the underlying arbitration." *City of New York v. Mickalis Pawn Shop, LLC,* 645 F. 3d 114, 136 (2d Cir. 2011) Here, Phiri has provided this Court with the entire arbitral record.[13] Even if the Arbitration Order is construed as indefinite or ambiguous, this Court "is permitted to interpret and enforce an ambiguous award if the ambiguity can be resolved from the record." *Flender Corp. v. Techna-Quip Co.,* 953 F.2d 273, 280 (7th Cir. 1992). For example, "[s]imply because the award does not quantify the money owed to a party does not necessarily mean that it is ambiguous or that a remand is warranted." *In re Global Reinsurance Corp. v. Yasuda Fire & Marine Ins. Co.,* 1999 US Dist. LEXIS 114 80 at *4-5 (S.D.N.Y. July 28, 1999), *citing Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.,* 868 F.2d 52, 58 (3rd Cir. 1989). An award can be confirmed where the true intent of the arbitrator is apparent. *See Blue Tee Corp. v. Koehring Co.,* 808 F. Supp. 343, 347 (S.D.N.Y. 1992), *aff'd,* 999 F.2d 633 (2d Cir. 1993); *American Centennial Insur. Co. v. Arion Insur., Co. Ltd.,* No. 88 Civ. 1665, 1990 WL 52295, 1990 U.S. Dist. LEXIS 4209 at *13 (S.D.N.Y. Apr. 13, 1990) (an award must be confirmed and need not be remanded to the arbitrator where the true intent of the arbitrator is apparent). The Panel intended, unquestionably, that RBC CM provide Phiri the SAIP.

Where arbitral awards are indefinite, incomplete, or ambiguous, the Second Circuit has highlighted the propriety of remand to a panel for clarification and not vacating the award. *See Rich v. Spartis,* 516 F.3d 75, 83 (2d Cir. 2008); *Am. Ins. Co. v. Seagull Compania Naviera, S.A.,* 774 F.2d 64, 67 (2d Cir. 1985). Remand should be used sparingly, however, because it delays execution of a final judgment on the arbitration award, and it incurs the danger of "frustrate[ing]

---

[13] *See* the April 11, 2017 Declaration of Todd A. Gutfleisch and annexed Exhibits annexed. (Document No. 25).

17

the basic purposes of arbitration: to resolve disputes speedily and to avoid the expense and delay of expensive court proceedings." *Federal Commerce and Navigation Co. v. Kanematsu-Gosho, Ltd.*, 457 F.2d 387, 389 (2d Cir. 1972). Here, as this Court has already observed, RBC's machinations implement a delay strategy. In deciding to agree to Phiri's SAIP condition, RBC did the math. Now, it is using its wealth to buy more time by litigating.

Further, remand should be granted cautiously because there is a likelihood that the arbitrator will believe "a 'remand' is equivalent to a 'retrial' with an expectation of an opposite result the second time around." *Fischer v. CGA Computer Associates, Inc.*, 612 F. Supp. 1038, 1041 (S.D.N.Y. 1985), quoting *Randall v. Lodge No. 1076 International Assoc. of Machinists & Aerospace Workers*, 648 F.2d 462, 468 (7th Cir. 1981). This is especially true in the matter *sub judice* because the Panel now is aware of Royal Bank's claim to own the SAIP notwithstanding that there is not "newly discovered evidence that, with reasonable diligence, could not have been discovered" before the Arbitration Order. Fed. R. Civ. P. 60 (b) (2).

RBC is wrong in contending that Rule 65(d) prohibits this Court from referring to the arbitral record in confirming the Arbitration Order.

> Rule 65(d) prohibits an enjoining court from describing "the act or acts sought to be restrained" "by reference to the complaint or other document." The Rule does not make a similar prohibition concerning any of its other requirements. That is, the Rule does not prohibit the court from describing "the reasons for [the injunction's] issuance" by reference to any extrinsic document. Had the drafters of the Federal Rules of Civil Procedure intended to prohibit an explanation of the reasons for an injunction by reference to an earlier opinion, they surely could have done so.

*In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2007 WL 2994395, 2007 U.S. Dist. LEXIS 76272 at *11-12 (S.D.N.Y. Oct. 16, 2007). On a similar note, the drafters could have, but did not, prohibit a court from reviewing the arbitral record to comply with Rule 65 (d)(1)(C) to issue

a confirmation order. Instead, case law is clear that remand is not the first alternative and the court can issue an appropriate confirmation order.

Moreover, RBC's motion is made pursuant to 9 U.S.C. §§ 9, 10, and 11. §11 (c) authorizes this Court to modify and correct the Arbitration Order to "effect the intent thereof and promote justice between the parties" if the Arbitration Order is "imperfect in matter of form not affecting the merits of the controversy." While this Court can issue a confirmation order complying with Rule 65 (d) without modifying the Arbitration Order, it can also modify the Arbitration Order. Contrary to RBC's arguments, the Panel ruled on the merits in Phiri's favor by granting his request for a mandatory injunction, to be effective "immediately," and made its intent clear: Phiri should be afforded a copy of the SAIP to use as he was promised. RBC's arguments are only about the form of the Arbitration Order or reflect its strategic decision not to disclose Royal Bank's alleged interest in the SAIP. To promote justice between the parties, RBC should be held to its written promise that induced Phiri to work outside the United States and disrupt his family life.

## II.    THE ARBITRATION ORDER SHOULD BE CONFIRMED AND BIND RBC

As discussed in the Statement of Facts and Point I of Phiri's April 18, 2017 Memorandum of Law in Support of his cross-motion to bind Royal Bank to the Arbitration Order (Docket No. 24),[14] RBC's arguments should be rejected and the Arbitration Order confirmed under estoppel, veil piercing/alter ego, and agency and contract principles of law. If this Court agrees that any confirmation order must comply with Rule 65, then under subpart (d)(2)(C), Royal Bank should be bound as well as "another person[] who [is] in active concert or

---

[14] This Court's April 20, 2017 Order (Document No. 45) stated that the Court "will consider Phiri's cross-motion for RBC to be bound by the arbitral award or for a schedule permitting Phiri to conduct expedited discovery in connection with the parties' motion to confirm or vacate the award."

participation with [the parties]."

In addition, *res judicata*, which precludes parties from re-litigating claims that were or could have been raised in a prior action, applies. *Akhenaten v. Najee, LLC*, 544 F.Supp.2d 320, 327 (S.D.N.Y. 2008). *Res judicata* applies when "(1) the previous action involved an adjudication on the merits, (2) the previous action involved the [parties] or those in privity with them [and] (3) the claims asserted in the subsequent action were, or could have been raised in the prior action." *Id.,* quoting *Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001). *Res judicata* applies to issues resolved by arbitration where there has been a final determination on the merits, even if the award has not been confirmed. *Kalyanaram v. New York Inst. of Tech.*, 549 Fed. Appx. 11, fn. 2 (2d Cir. 2013), quoting *Jacobson v. Fireman's Fund Ins. Co.*, 111 F. 3d 261, 267-68 (2d Cir. 1997) (holding that "*res judicata* and collateral estoppel apply to issues resolved by arbitration where there has been a final determination on the merits, notwithstanding a lack of confirmation of the award").

The Second Circuit has consistently held that the doctrine of *res judicata* extends to nonparties "who are in privity with the parties to the first action." And, the doctrine is to be applied with flexibility. *The Amalgamated Sugar Co. LLC v. NL Indus., Inc.,* 825 F.2d 634, 640 (2d Cir. 1987). The Supreme Court has clarified the exceptions to the rule that non-parties may not be bound by a prior judgment:

> A non-party may be bound by a prior determination if: . . . second, preclusion may be justified based on a variety of "pre-existing 'substantive legal relationship[]' between the person to be bound and a party to the judgment . . . Third, . . . a nonparty "was adequately represented in the earlier action by someone with the same interests who was a party to the suit" . . . ; [or] Fourth the nonparty . . . "assumed control" over the [earlier action]. . .

*Taylor v. Sturgell*, 553 U.S. 880, 894-895 (2008). (Internal citations omitted.) There is obviously a "preexisting substantive legal relationship" between Royal Bank and RBC CM.

## III.    THE PANEL DID NOT EXCEED ITS AUTHORITY BY RULING ON THE EVIDENCE THE PARTIES PROFFERED

### A.    In Issuing The Arbitration Order, The Panel Acted Within Its Authority Based On The Evidence Adduced At The Hearing

It is axiomatic that an arbitral panel can rule only on the evidence adduced. RBC admits that they "advisably" and deliberately withheld from the Panel evidence of the SAIP's purported owner to avoid a risk of Royal Bank being made a party to the arbitration. Having made that strategic decision, RBC should be estopped from arguing that the Panel exceeded its authority.

As to RBC's 9 U.S.C. §10(a)(4) argument about the Panel's authority, the Second Circuit has "consistently accorded the narrowest of readings" to this statutory ground, *Westerbeke Corp.,* 304 F.3d at 220 (internal quotation marks omitted), focusing on "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa v. Dean Witter Reynolds, Inc.,* 121 F.3d 818, 824 (2d Cir. 1997). "The scope of authority of arbitrators generally depends on the intention of the parties to an arbitration, and is determined by the agreement or submission." *Synergy Gas Co. v. Sasso,* 853 F.2d 59, 63-64 (2d Cir. 1988).

In the FINRA Uniform Submission Agreement, Phiri and RBC CM agreed to submit to arbitration "the present matter in controversy, as set forth is the attached statement of claim, answers cross-claims and all related counterclaims, and/or third-party claims which may be asserted. . ."[15] RBC ignores the written judicial admission in state court that RBC CM is the SAIP's "undisputed owner." Instead, RBC Arbitration Answer, opening and closing statements witness testimony, and documents submitted to the Panel never raised the ownership issue. Instead, RBC CM disingenuously argued that any agreement Phiri relied upon had been made by

---

[15] *See* Ex. L to the March 10, 2017 Declaration of Mitchell S. Cohen submitted in support of Phiri's motion to confirm, the parties' Uniform Submission Agreement at ¶1.

RBTB and omitted any mention of Royal Bank. RBC CM, as well as Royal Bank, had a full and fair opportunity to assert Royal Bank's alleged SAIP ownership in the arbitration by their joint counsel. They chose to conceal information.

RBC's case citations are off-point. Not one addresses an arbitral party deliberately withholding information. For example, in *Orion Shipping & Trading Co. v. Eastern Petroleum Corp.*, 312 F.2d 299 (2d Cir. 1963), the plaintiff secured an order compelling defendant to arbitrate questions of contract breach and damages. Defendant's guarantor was not a party to the arbitration although the award against the guarantor demonstrates disclosure of the guaranty at least during the arbitration. The Second Circuit affirmed the lower court's *vacatur* of that portion of the arbitral award that was against the non-party guarantor while acknowledging that plaintiff could sue the guarantor directly.

Similarly in *FIAT S.p.A. v. Ministry of Finance & Panning*, No. 88 Civ. 6639, 1989 WL 122891, 1989 U.S. Dist. LEXIS 11995 (S.D.N.Y. Oct. 12, 1989), there is no indication that material facts were withheld from the panel. The Court vacated that portion of an arbitral award against *FIAT* because *FIAT*: (i) did not sign the arbitral agreement; (ii) was not a party to the arbitration; (iii) did not receive notice of the arbitration's commencement or proceedings; and (iv) did not receive a copy of the final award. In contrast, Royal Bank had notice of Phiri's arbitration, acted in concert with RBC CM in misstating the SAIP's purported ownership before the state court, had its in-house counsel attend the arbitration, and withheld material information from the Panel, thwarting the legislative goals of quick and inexpensive issue resolution.

RBC's other case citations are equally inapposite and do not address a party's proceeding with an arbitration under false premises. *See Schaad v. Susquehanna Capital Group*, No. 03 Civ. 9902, 2004 U.S. Dist. LEXIS 15772, 2004 WL 1794481 (S.D.N.Y. Aug. 10, 2004) (vacating an

arbitration award against non-signatories where plaintiff was unable to show that they benefitted from the agreement containing the arbitration clause); *Hendricks v. Feldman Law Firm LLP*, No. 14-826, 2015 U.S. Dist. LEXIS 129001, 2015 WL 5671741 (D. Del. Sept. 21, 2015) (vacating an arbitration award that ordered the defendant to "exercise control over a non-party" thus imposing an obligation on the non-party).

As discussed in Point I(C)(1) of Phiri's April 18, 2017 Memorandum of Law in Support of his cross-motion to bind Royal Bank to the Arbitration Order (Document No. 44), RBC's misstatement about the SAIP's ownership and ongoing concealment prevented Phiri, when litigating to obtain Justice Friedman's TRO in December of 2016 and after, from asking a court to require Royal Bank to arbitrate under *MAG Portfolio Consult, GmbH v. Merlin Biomed Group, LLC*, 268 F.3d 58, 61 (2d Cir. 2001) ("where a company 'knowingly accepted the benefits' of an agreement with an arbitration clause, even without signing the agreement, that company may be bound by the arbitration clause") or under principles of veil piercing/alter-ego and agency and contract law. RBC should not be permitted to benefit from its wrong doing.[16]

## B.    The Arbitration Order Is Consistent With The Law And Was Not Made In Manifest Disregard Of The Law

RBC overlooks that both Phiri and RBC CM provided the Panel with Post Hearing Briefs discussing the controlling precedents and copies of the cases each cited.[17] There is no basis for RBC's "manifest disregard of the law" argument. Although the Supreme Court has declined to decide whether the "manifest disregard" standard continues to survive as a basis for *vacatur* following the Court's decision in *Hall Street Associates, LLC v. Mattel, Inc.*, 552 U.S. 576

---

[16] *See* Phiri's April 18, 2017 Memorandum of Law in Opposition to Royal Bank's Motion To Intervene at Point I(A).

[17] *See* Gutfleisch Opposition Dec., sworn to on April 25, 2017 at Ex. I.

(2008), in *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662 (2010), the court assumed "*arguendo*" that the manifest disregard standard "require[es] a showing that the arbitrators 'knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the dispute, and willfully flouted the governing law by refusing to obey it'." *Id.* at 582. The Second Circuit largely tracks the standard assumed *arguendo* in *Stolt-Nelson. See, e.g., Jock v. Sterling Jeweler Inc.*, 646 F.3d 113, 121 fn. 1 (2d Cir. 2011) (to apply the manifest disregard standard the court must "consider, first, 'whether the governing law alleged to have been ignored by the arbitrators was well defined and clearly applicable,'" and, second whether the arbitrator knew about the 'existence of a clearly governing legal principle but decided to ignore it or pay no attention to it'").

At the hearing, Phiri demonstrated RBC CM promised him and agreed to provide him the SAIP in emails from May 28, 2015 through June 1, 2015, after months of fruitless discussions and with RBC about to move its statistical arbitrage business outside the United States. RBC misdirects this Court by pointing to draft immigration transfer letters issued before the email exchange and for months after that were never completed and signed. The drafts do not fully reflect the deal made. RBC arguments do not mean that the parties did not already have an enforceable agreement or that RBC did not make an enforceable written promise that Phiri relied upon when he worked in the Bahamas. Not only has RBC always known what is the SAIP, Macdonald promised "[i]n addition, should this right [concerning deferred compensation] be exercised after one year of employment in the Bahamas or if you are dismissed without cause, you will also be afforded IP specific to the Stat Arb business along with a right to the related track record (non-audited or affirmed)" That is a specific and enforceable promise and the Panel's Injunction Order reflected the hearing evidence in Phiri's favor and is entirely consistent

24

with New York law."[18] *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (1st Dep't 2009). In interpreting the parties' agreement expressed in the May 28-June 1, 2015 email exchange, the Panel "effectuat[ed] the true intent of the parties." *Furgang v. Epstein,* 106 A.D.2d 609 (2d Dep't 1984).

While Phiri worked for over a year and moved his family outside the United States, RBC accepted the fruits of Phiri's labor without protest or question. "Perhaps the strongest indication that a party has assented to a contract is when that party accepts the benefits of the agreement without reservation." *H&H Acquisition Corp. v. Fin. Intranet Holdings, Inc.*, 669 F. Supp. 2d 351, 359-360 (S.D.N.Y. 2009). For months, RBC analyzed carefully Phiri's request for a *quid pro quo* to afford him the SAIP to work outside the United States. After an economic and other evaluation, RBC agreed in writing to provide Phiri the SAIP if he was fired without cause.[19]

As the Second Circuit has stated: "performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it

---

[18] The hearing evidence overwhelmingly proved RBC's expression of binding intent to Mr. Phiri and internally. See, for example, Arb. Ex. 50 (Pagano confirming that Mr. Phiri is committed to going to the Bahamas), Arb. Ex. 51 (Mr. Macdonald confirming to Mr. Phiri "we got to green.") and Arb. Ex. 56 (Mr. Macdonald confirming to Michael Bowick that Mr. Phiri was going to the Bahamas), and Arb. Ex. 119 (Mr. Macdonald's email to Mr. Bowick and others identifying the agreement invoked by Phiri). Also, on January 30, 2017, Mr. Macdonald testified that Mr. Bowick "blamed" Mr. Macdonald for the agreement, Arb. Tr., p. 120, line 3 to 121, lines 7-17.

[19] Macdonald "comfortably recommend[ed]" the Phiri to his RBC collegues deal and described it as "fair and necessary for [RBC] to agree to with and the worst case being that one more quant player is out there competing against us" [Arb. Ex. 46, p. RESP. 000562], and Macdonald even had Brad Beutter double-check the deal to opine that it was "low risk, fair and appropriate." [Arb. Ex. 49] Macdonald specifically informed Bowick of this [Arb. Ex. 49], before writing Phiri "we got to green." [Arb. Ex. 51]. Subsequently, Macdonald confirmed with RBC's Helena Pagano that another RBC executive also favored the deal made [Arb. Ex. 55], and Mr. Macdonald ratified the agreement writing Phiri that the goal posts were not moving. [Arb. Ex. 67]

also understands a contract to be in effect." *R.G. Group, Inc. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984).[20] *See also Viacom International Inc. v. Tandem Productions, Inc.* 368 F. Supp. 1264, 1270 (S.D.N.Y. 1974) (performance for a year "is strong circumstantial proof that the minds of the parties had met on the essential elements, and that they were not waiting for a formal written instrument"), *aff'd* 526 F. 2d 593 (2d Cir. 1975). It is well established that a court must uphold an arbitral award provided there is "a *barely colorable justification* for the outcome reached." *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*. 548 F.3d 85, 92 (2d Cir. 2008).

## IV.  RBC's Arguments Against Applying Estoppel Disregard Its Conduct and Fail

RBC argues against estoppel contending that Phiri sustained no detriment.  To the contrary, RBC's concealment denied Phiri any opportunity to: (i) to include Royal Bank in the arbitration: (ii) sue for a judicial determination that Royal Bank was obligated to arbitrate based on the direct benefit it receives from RNC CM's FINRA listing; (iii) seek alternative damage; or (iv) simultaneously sue Royal Bank in court while arbitrating with RBC CM. RBC CM's affirmative judicial ownership admission and RBC's subsequent concealment of any contrary facts set the arbitration's course. RBC has exponentially increased Phiri's litigation costs and dramatically impacted and delayed a resolution of his claims.

As RBC acknowledges, judicial estoppel can be invoked against a party who "at least received some benefit from the previously taken inconsistent position." *McSherry v. Giannuzzi*, 717 F. Supp. 238, 242 (S.D.N.Y. 1989).  RBC CM's misrepresentation prevented Phiri from pursuing his claims against Royal Bank in arbitration, RBC's admitted goal.

Equally misdirected are RBC's arguments against the application of collateral estoppel. RBC admits the party to be estopped must have: (1) [engaged in] conduct with amounts to a false

---

[20] In *R.G. Group,* the Court found no binding agreement where the parties expressly reserved not being bound absent an executed agreement.

representation or concealment of material facts; (2) intended that such conduct [would] be acted upon by the other party; and (3) [known] the real facts." *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996). Here, RBC: (1) made a judicial misrepresentation and continued to conceal the truth; (2) intended that Phiri forego attempting to compel Royal Bank to arbitrate; and (3) [knew] the "real" facts. Any RBC suggestion otherwise ignores that its goal was to keep Royal Bank out of the arbitration. Phiri: (1) believed that RBC CM owned the SAIP when it agreed to afford it to him; (2) relied on RBC CM's written judicial admission in foregoing any action against Royal Bank or even discovery about it having an interest in the SAIP; and (3) spent substantial time and money to pursue arbitration which, according to RBC, resulted in a pyric victory. In short, contrary to RBC's contention, Phiri: (1) lacked knowledge of the "true" facts; (2) relied on RBC CM's conduct; and (3) adjusted his position to his detriment by not seeking discovery about or attempting to compel Royal Bank to arbitrate or otherwise be required to provide him the SAIP. *United States ex rel. Damuth Servs. v. W. Sur. Co.*, 368 Fed. Appx. 383, 387 n. 4 (2d Cir. 2010). By RBC's own articulation of the basis for collateral estoppel, RBC is collaterally estopped.

RBC's contention that it lacked standing to seek a stay of arbitration is wrong.[21] A non-party as well as a party to an arbitration clause can move to stay an arbitration. In *Golub v. Kidder, Peobody & Co.*, No. 89 Civ. 5903, 2000 WL 1024688, 2000 U.S. Dist. LEXIS 10268 (S.D.N.Y. July 24, 2000), the Court granted a nonparty's motion to stay an arbitration where the court concluded that the party demanding arbitration had not established that the nonparty was

---

[21] Page 9 of Phiri's March 29, 2017 Reply Memorandum for a Preliminary Injunction incorrectly cites three cases, *i.e.*, *CRT Capital Grp. v. SLS Capital, S.A.*, 63 F. Supp. 3d 367 (S.D.N.Y. 2014); *Opals on Ice Lingerie, Designs by Bernadette Inc. v. Bodylines Inc.*, 320 F.3d 362 (2d Cir. 2003); *AGCO Corp. v. Anglin*, 216 F.3d 589 (7th Cir. 2000), that involved arbitral parties. The mistake was inadvertent and counsel sincerely apologizes.

27

bound to arbitrate under any of the factors stated in *Thomson-CSF, S.A. v. American Arbitration Association*, 64 F.3d 773, 776 (2d Cir. 1995). Moreover, the same reasons that Royal Bank asserted to intervene in this proceeding would have served as the basis for Royal Bank to have moved to stay the underlying arbitration.

## V.    ROYAL BANK HAS NOT ESTABLISHED THAT IT OWNS THE SAIP OR ESTABLISHED ITS ENTITLEMENT TO A DECLARATORY JUDGMENT

The Declaratory Judgment Act, 28 U.S.C. 2201(a), states that, when there is an actual controversy, a court "may declare the rights and other legal relations of any interested party seeking such declaration." RBC submits only the ASA and its Schedule and not any prior agreement, leaving open the question of the SAIP's owner when RBC CM promised to afford Phiri the SAIP, more than two months before the ASA was amended and restated. For this reason alone, RBC's request for a declaration should be denied.

Even if Royal Bank is the SAIP's owner, Royal Bank should be bound by the Arbitration Order under principles of estoppel, *res judicata*, agency/veil-piercing, and agency and contract. Thus, RBC does not raise a justiciable controversy because the declaration its seeks will not resolve its dispute with Phiri or determine whether RBC CM breached any obligation it may have to Royal Bank and should indemnify Royal Bank pursuant to the ASA.

In general, courts "possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). In deciding whether to exercise jurisdiction, a court must consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). Declaring

Royal Bank the SAIP's owner will not achieve any of these goals and it comes to this Court with unclean hands.

## CONCLUSION

This Court should promptly confirm the Arbitration Order against RBC and to the extent necessary issue a confirmation order that specifies what RBC is to provide Phiri.

Dated: New York, New York
           April 25, 2017

                                        WECHSLER & COHEN, LLP

                                        _Todd Du_____

                                        Mitchell S. Cohen
                                        Todd A. Gutfleisch
                                        Debora A. Pitman
                                        *Attorneys for Plaintiff*
                                        17 State Street, 7th Floor
                                        New York, New York 10004
                                        Telephone: (212) 847-7900

29