UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TEBOGO PHIRI,

      Plaintiff,

  - against -

RBC CAPITAL MARKETS, LLC and ROYAL
BANK OF CANADA,

      Defendants.

Case No. 1:17-cv-01661-RJS

**MEMORANDUM OF LAW IN OPPOSITION TO PHIRI'S MOTION TO BIND RBC
TO THE ARBITRAL ORDER**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

LEGAL ARGUMENT .......................................................................................................... 7

    I.      Phiri Fails to Overcome the Rule that Non-Signatories to an Arbitration
           Agreement Cannot Be Bound ..................................................................... 8

           A.      Royal Bank of Canada and RBC Capital Markets, LLC are not
                    alter egos .................................................................................... 8

           B.      RBC Cannot be Bound to the Order Based on Agency Principles .......... 15

           C.      RBC is not Bound to the Arbitral Order Under Direct Benefit
                    Estoppel....................................................................................... 16

    II.     RBC Is Not Estopped From Asserting Its Ownership of the Intellectual
           Property.................................................................................................... 18

           A.      RBC is not judicially estopped because it took no position in the
                    state court proceeding ............................................................... 19

           B.      RBC is not equitably estopped because it made no false
                    representation upon which Phiri relied to his detriment ......................... 19

                1.      RBC made no false representations and did not violate a
                        legal duty to speak ...................................................... 20

                2.      Phiri had knowledge of the facts.................................. 22

                3.      Phiri cannot establish detrimental reliance ................. 23

CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alfa Laval U.S. Treasury Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
857 F. Supp. 2d 404 (S.D.N.Y. 2012) .......................................................................................18

*Am. Bartenders Sch., Inc. v. 105 Madison Co.*,
59 N.Y.2d 716, 463 N.Y.S.2d 424 (1983) ................................................................................23

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
170 F.3d 349 (2d Cir. 1999) .....................................................................................................18

*Amedeo Hotels Ltd. P'ship v. N.Y. Hotel & Motel Trades Council*,
AFL-CIO, No. 10 CIV. 6150 NRB, 2011 WL 2016002 (S.D.N.Y. May 18,
2011) ....................................................................................................................................22, 23

*Amedeo Hotels Ltd. P'ship v. N.Y. Hotel & Motel Trades Council*,
AFL-CIO, No. 10 CIV. 6150 NRB, 2011 WL 2016002 (S.D.N.Y. May 18,
2011) .........................................................................................................................................15

*In re Arbitration*
*between Promotora de Navegacion, S.A. and Sea Containers, Ltd.*, 131 F.
Supp. 2d 412 (S.D.N.Y. 2000) ...........................................................................................5, 7, 24

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) ...................................................................................................................7

*Ayco Co. L.P. v. Frisch*,
No. 1:11-CV-580, 2012 WL 42134 (N.D.N.Y. Jan. 9, 2012) .......................................13, 16, 17

*Ayco v. Becker*,
2011 WL 3651027 ..........................................................................................................13, 15, 17

*Cantor Fitzgerald Partners v. Mun. Partners, LLC*,
11 A.D.3d 247, 782 N.Y.S.2d 434 (1st Dep't 2004) ................................................................22

*Chartis Seguros Mexico, S.A. v. HLI Rail & Rigging, LLC*,
967 F. Supp. 2d 756 (S.D.N.Y. 2013) ...................................................................................6, 22

*Cohen Lans LLP v. Naseman*,
No. 14-CV-4045 (JPO), 2017 WL 477775 (S.D.N.Y. Feb. 3, 2017) .......................................20

*Continental Group, Inc. v. NPS Communications, Inc.*,
873 F.2d 613 (2d Cir. 1989) .......................................................................................................7

## TABLE OF AUTHORITIES

(continued)

Page(s)

*Cook Indus., Inc. v. C. Itoh & Co. (Am.), Inc.*,
    405 U.S. 921 (1972)................................................................................21

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985)...........................................................................6, 22

*Fidenas AG v. Honeywell Inc.*,
    501 F. Supp. 1029 (S.D.N.Y. 1980)......................................................11

*Kalin v. Xanboo, Inc.*,
    No. 04 Civ. 5931 RJS, 2009 WL 928279 (S.D.N.Y. Mar. 30, 2009)................................9, 10

*Kosakow v. New Rochelle Radiology Associates, P.C.*,
    274 F.3d 706 (2d Cir. 2001)...................................................................21

*Life Techs Corp. v. AB Sciex Pte. Ltd.*,
    803 F. Supp. 2d 270 (S.D.N.Y. 2011)....................................................18

*MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*,
    268 F.3d 58 (2d Cir. 2001).....................................................................10

*McAnaney v. Astoria Fin. Corp.*,
    665 F. Supp. 2d 132 (E.D.N.Y. 2009) ...................................................12

*McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*,
    14-cv-6633, 14-cv-6675 (KBF), 2015 U.S. Dist. LEXIS 3347 (S.D.N.Y. Jan.
    12, 2015) ................................................................................................18

*Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.*,
    337 F.3d 125 (2d Cir. 2003)............................................................13, 16

*Morgan, Olmstead, Kennedy & Gardner Inc. v. U.S. Trust Co. of N.Y.*,
    608 F. Supp. 1561 (S.D.N.Y. 1985)....................................................6, 22

*N.Y. Hotel & Motel Trades Council, AFL-CIO v. Hotel Nikko of N.Y., Inc.*,
    Nos. 91 Civ. 0795 (DNE), 91 Civ. 0755 (DNE), 1991 WL 168284 (S.D.N.Y.
    Aug. 22, 1991) .......................................................................................22

*Nasso v. Bio Reference Labs., Inc.*,
    892 F. Supp. 2d 439 (E.D.N.Y. 2012) .............................................20, 24

*Nat'l Wrecking Co. v. Int'l Bd. Of Teamsters, Local 731*,
    957 F.2d 990 (7th Cir. 1993) .................................................................21

## TABLE OF AUTHORITIES

(continued)

Page(s)

*NPS Commc'ns, Inc. v. Cont'l Grp., Inc.,*
    760 F.2d 463 (2d Cir. 1985)......................................................................6, 7, 22

*O'Donnell v. Club Mediterranee S.A.,*
    No. 05-CV-610 (ARR), 2008 WL 794975 (E.D.N.Y. Mar. 24, 2008)...................14

*Oppenheimer & Co. v. Deutsche Bank AG,*
    No. 09 Civ. 8154(LAP), 2010 WL 743915 (S.D.N.Y. Mar. 2, 2010) ........................... *passim*

*Phoenix Cos. Inc. v. Abrahamsen,*
    No. 05 Civ. 4894 (WHP), 2006 WL 2847812 (S.D.N.Y. Sept. 28, 2006) ..............17

*Readco, Inc. v. Marine Midland Bank,*
    81 F.3d 295 (2d Cir. 1996)..............................................................................20

*Sarhank Grp. v. Oracle Corp.,*
    404 F.3d 657 (2d Cir. 2005)........................................................................11, 12

*Schaad v. Susquehanna Capital Grp.,*
    No. 03 Civ. 9902(LTS)(DFE), 2004 WL 1794481 (S.D.N.Y. Aug. 10, 2004) ...............17, 18

*Slaney v. The Int'l Amateur Athletic Fed'n,*
    244 F.3d 580 (7th Cir. 2001) ..........................................................................21

*Societe d'Assurance de l'Est SPRL v. Citigroup Inc.,*
    No. 10 CIV. 4754 JGK, 2011 WL 4056306 (S.D.N.Y. Sept. 13, 2011).....................8, 12, 14

*Techcapital Corp. v. Amoco Corp.,*
    No. 99 Civ. 5093, 2001 WL 267010 (S.D.N.Y. Mar. 19, 2001) .................................6

*Tenamee v. Schmukler,*
    438 F. Supp. 2d 438 (S.D.N.Y. 2006).................................................................20

*Thomson–CSF, S.A. v. Am. Arbitration Ass'n,*
    64 F.3d 773 (2d Cir. 1995)........................................................................8, 9, 10, 18

*United Paperworkers Int'l Union v. T. P. Prop. Corp.,*
    583 F.2d 33 (1st Cir. 1978)..............................................................................12

*United States v. Hussein,*
    178 F.3d 125 (2d Cir. 1999)..............................................................................19

*United Steelworkers of Am., AFL-CIO-CLC v. Smoke-Craft, Inc.,*
    652 F.2d 1356 (9th Cir. 1981) ..........................................................................21

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574 (1960)......................................................................................................................7

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
    489 U.S. 468 (1989)......................................................................................................................6

STATUTES

9 U.S.C. § 4....................................................................................................................................15

OTHER AUTHORITIES

12 C.F.R. 225.2..............................................................................................................................12

12 C.F.R. § 225.2(e)(1)(i)..............................................................................................................12

Royal Bank of Canada ("RBC") submits this memorandum of law in opposition to Phiri's motion to bind RBC to the Arbitral Order

## PRELIMINARY STATEMENT

Phiri's motion spends little time on the facts and law that are directly relevant to—and undercut—his arguments. Instead, he and his counsel seek to avoid analysis of the factors courts consider in determining whether to take the extraordinary step of binding a non-party to an arbitration by contending RBC and/or RBC Capital Markets, LLC ("RBCCM") "deliberately concealed" the fact that RBC had ownership rights to intellectual property at issue, as part of a strategy to get two bites at the apple" in the event a FINRA arbitration panel ruled against RBCCM. This accusation of "concealment" of RBC's ownership rights appears in one form or another no less than 17 times in this brief alone.

This contention is false. The zeal of Phiri and his counsel to portray RBC, RBCCM and their counsel negatively has led them to go too far. The sworn declaration of RBCCM's counsel refuting the claim makes this clear. *See* Declaration of Patrick W. Shea, dated April 18, 2017. But there is more. Buried in the arbitration transcript (in testimony that came along well after the mistaken statement regarding ownership made in state court), Phiri acknowledged in response to questioning from his own counsel that *he was well aware RBC had ownership rights*, specifically to the very servers containing the IP at issue. While he was unsure of the exact licensing arrangement, he also knew that RBCCM employees had licensing rights for access throughout his time in New York and in the Bahamas:

Q: By the way, you mentioned the quant trading intellectual property, that's obviously what the issue is? I know physically we looked at the programs and such and the databases. Literally where is this stuff?

A: So the code is in – it's on New York serv[ers], even when we were in the Bahamas, we were using New York based serv[ers].

***

Q: *Who owns those file servers?*

1

A: ***I mean, I'll generally say RBC, but RBCCM LLC employees have access to those and I just don't know the cut structure how RBC says who specifically owns them, how it's licensed,*** *but I know that CMLLC employees have, because when I was in New York, that's what I used and we didn't change that when I moved to the Bahamas.*

Arb. Tr.[1] 582:17-583:20 (emphasis added).

This knowledge is not surprising Phiri worked at RBCCM for nearly 20 years, and so was very familiar with the ins and outs of the trading strategies he worked with every day. But it makes his current accusations of deception and concealment disingenuous, to say the least.

The same is true of the supposed strategy to get "two bites at the apple." That was *Phiri's* strategy. How do we know this? Phiri's counsel himself let it slip in the state court proceedings, revealing that if he could not get what he wanted on an expedited basis from FINRA, he would just come back to court for another round, to seek the same thing: "[I]f FINRA decides we cannot use the [expedited arbitration] process, we will come back to this Court to seek a preliminary injunction on the merits." Declaration of Victoria A. Cundiff, dated April 18, 2017 ("Cundiff Decl."), Ex. 3 at 5:21-23. The court reacted negatively: "Let me tell you something, if you have to come back to this Court, you are going to have to litigate this case in a different way than what I'm seeing here today." *Id.* at 6:4-7.

Phiri's counsel has made further misrepresentations to this Court. He accuses RBCCM of "negotiating to convert a TRO into a preliminary injunction to maintain the SAIP after omitting the phrase that encompass RBCCM affiliates because it was not necessary", as if that were part of a plan to conceal RBC's ownership rights. In fact, however, the preliminary injunction imported the TRO language without modification. Cundiff Decl. Exs. 1 and 2.

---

[1] All references herein to the Arbitration Transcript ("Arb. Tr.") refer to Exhibit B to the Declaration of Todd A. Gutfleisch dated April 11, 2017 (Transcripts of FINRA Arbitration *Tebogo Phiri v. RBC Capital Markets, LLC*, No. 16-03614).

Enough is enough.  It is Phiri, not RBC, who has concealed facts, and it is Phiri's counsel, not RBC's or RBCCM's, who has made misleading statements in order to avoid the merits.  The bottom line is that Phiri failed to satisfy his heavy burden of proving RBC should be bound by an arbitration in which it never participated.  He cannot hide from this failure by making false accusations of misconduct.

## **BACKGROUND**

The facts are more fully set forth in the Declarations of Patrick Shea, sworn to April 18, 2017 ("Shea Decl."), the Declaration of Patrick Shea, sworn to March 22, 2017 ("Mar. Shea Decl."), the Declaration of Victoria Cundiff, sworn to April 18, 2017 ("Cundiff Decl."), the Declaration of Caitlin D. Brown, sworn to April 25, 2017 ("Brown Decl.") and the Declaration of Pablo Kapusta, sworn to April 25, 2017 ("Kapusta Decl.").  They are briefly summarized below.

Phiri, a former employee of RBCCM, an indirect subsidiary of RBC, began the proceedings at issue on December 12, 2016, by filing a Statement of Claim for arbitration with the Financial Industry Regulatory Authority ("FINRA") against RBCCM, as well as a Petition in New York State Supreme Court seeking a temporary restraining order requiring RBCCM to preserve a copy of broadly defined intellectual property and seeking to compel it to participate in expedited discovery in aid of arbitration.  The state court denied Phiri's request for expedited discovery and issued a temporary restraining order requiring RBCCM and "its agents, and all others acting under or with it," to preserve a copy of broadly defined intellectual property.[2] Cundiff Decl. Ex. 1 (*Phiri v. RBC Capital Markets, LLC,* Case No. 656455/16, Dkt. No. 10, Order dated December 15, 2016).

---

[2] RBCCM objected to the definition Phiri proffered to describe the intellectual property at issue. Cundiff Decl. Ex. 3 at 13:12-14:24.

Contrary to Phiri's repeated misrepresentation in his Memorandum of Law in Support of his Motion for Royal Bank to be Bound by the Arbitral Order ("Mem. to Bind") that the state court and Phiri converted the TRO into a preliminary injunction with a much narrower scope to encompass only RBCCM (*see, e.g.,* Mem. to Bind at 6, 7, and 17), in fact, by stipulation of the parties, this temporary restraining order was subsequently converted to a preliminary injunction without modification. *See* Cundiff Decl. Ex. 2.

Over RBCCM's objections, Phiri then used the state court's issuance of a routine preservation order to obtain an expedited FINRA arbitration regarding completely separate injunctive relief against RBCCM, seeking the right to use unspecified intellectual property. This expedited arbitration—which began 23 days after Phiri filed his Statement of Claim—denied RBCCM many of the limited procedural protections normally guaranteed by FINRA.

Phiri's pleadings and actions in the arbitration show that he was well aware that he was improperly seeking relief against non-parties to the arbitration and that he fully intended to do so. For example, in his Statement of Claim, Phiri alleged promises by non-parties, asserted that "RBC LLC and certain of its affiliates" had promised to provide him with intellectual property, and made a series of assertions calculated to create the impression that RBCCM's affiliated entities were all one organization.[3] Under questioning by his own attorney a month after the state court hearing, Phiri testified that he knew that RBC owned the file servers containing the

---

[3] In his Statement of Claim, Phiri defined RBC Capital Markets, LLC as "RBC LLC," and defined "RBC" as "RBC LLC and certain of its affiliates that operated together as 'RBC Capital Markets.'" Mar. Shea Decl. Ex. 1 (Phiri's Statement of Claim), ¶¶ 1 and 3. Phiri then asserted that "RBC LLC and RBC agreed to Phiri's condition" regarding intellectual property (*id.* ¶ 70), but that Phiri's proposal "required RBC to provide Phiri the SAIP [statistical arbitrage intellectual property]." (*Id.* ¶ 39).

"quant trading intellectual property," that RBCCM employees "have access" to them and that he did not know "how RBC says who specifically owns them, how it's licensed."[4]

Throughout the arbitration, despite his knowledge of RBC's ownership rights, his own claims against non-parties and RBCCM's disclosures and arguments that Phiri had brought his action against the wrong party,[5] Phiri chose to take no action to compel the other parties to join the arbitration or to proceed against them in court, where those parties would have been entitled to the full procedural protections guaranteed by the court system. Instead, Phiri sought to effectively bind these parties to an expedited FINRA arbitration—and deny them their due process rights—by urging the arbitration panel to ignore the corporate form.[6] However the panel had no authority to do so. Such power rests with the court alone.

Phiri's decision to take no action despite being aware that his dispute actually encompassed multiple parties, only one of which had agreed to arbitrate, appears to have been a calculated one. Phiri is not the first Claimant to devise this strategy—and indeed, it is one inherent in the fact that when a dispute encompasses both parties who have agreed to arbitrate and parties who have not, the dispute will need to be resolved in multiple forums. *See In re Arbitration between Promotora de Navegacion, S.A. and Sea Containers, Ltd.*, 131 F. Supp. 2d 412, 421 (S.D.N.Y. 2000) (in the face of an assertion that non-party's decision not to participate in the arbitration gave non-party a "second bite at the apple" to challenge the arbitral award in court, the court found it "at least as plausible to infer that" Claimant in arbitration "strategically

---

[4] Arb. Tr. 582:17-583:21.

[5] Arb. Tr. 160:3-4; 116:16-18.

[6] Arb. Tr. 124: 10-11, 1201:4-14.

5

chose not to move to compel th[e] participation [of non-party parent entity] because such a motion might have failed.")[7]

Having failed to take earlier action to compel RBC to arbitrate and having won in the arbitration against RBCCM, Phiri now argues that he should be able to take the extraordinary step of enforcing the arbitration award against RBC, which has provided documentary evidence that it owns intellectual property at issue, without having any tribunal hear from RBC on the merits.  While he cloaks this request in claims of "fairness" and "equity" and interjects invidious terms about purported misrepresentations and concealment, the record shows that Phiri knew the facts, no such misrepresentations or concealment occurred, and his request is anything but fair and equitable.  Instead, it is part of Phiri's ongoing campaign to deprive RBC of its right to be heard as most recently evidenced by Phiri's filing of a motion simultaneously seeking to bind RBC to the Arbitral Order while opposing RBC's intervention into the matter.

Contrary to law, Phiri now asserts that even though RBC did not agree to arbitrate, it should have voluntarily intervened in the arbitration—in other words, that to protect its interests RBC was required to sacrifice its right to proceed in court and participate in an arbitration to which it did not consent, despite the fact that arbitration "is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,* 489 U.S. 468, 479 (1989). Finding that RBC had an obligation to intervene in the arbitration would eviscerate the voluntary nature of arbitration.  The law does not so hold.  *See, e.g., Techcapital Corp. v. Amoco Corp.,*

---

[7] Indeed, where some claims are subject to arbitration and others are not, "second bites" are inevitable, as the disputes must proceed in arbitration and court respectively, "even when the result would be the possibly inefficient maintenance of separate proceedings in different forums." *See, e.g., Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985); *NPS Commc'ns, Inc. v. Cont'l Grp., Inc.*, 760 F.2d 463, 466 (2d Cir. 1985); *see also Chartis Seguros Mexico, S.A. v. HLI Rail & Rigging, LLC,* 967 F. Supp. 2d 756, 765 (S.D.N.Y. 2013); *Morgan, Olmstead, Kennedy & Gardner Inc. v. U.S. Trust Co. of N.Y.*, 608 F. Supp. 1561, 1568-69 (S.D.N.Y. 1985).

No. 99 Civ. 5093, 2001 WL 267010, at *4 (S.D.N.Y. Mar. 19, 2001) (permitting non-party whose rights had been affected by arbitration to be heard in court even though it had not intervened in the arbitration).

Against this fundamental principle, which his counsel derides RBC for asserting "*ad nauseum,*" (Mem. to Bind at 13), Phiri counters that RBC should be bound to the Arbitral Order under a variety of common law theories, including alter ego, piercing the corporate veil, and estoppel.  As described below, Phiri cannot satisfy the heavy burden the law imposes on those invoking these theories.  RBCCM and RBC exist in a conventional subsidiary/parent relationship and have not abused the corporate form to commit fraud.  No other reason exists to bind a non-party to the Arbitral Order. The Court should vacate the Arbitral Order as improperly adjudicating rights to RBC's property.

## LEGAL ARGUMENT

"[A]rbitration is and must be consensual," *Continental Group, Inc. v. NPS Communications, Inc.*, 873 F.2d 613, 617 (2d Cir. 1989), as "[c]ommercial arbitration is a creature of contract," *Promotora*, 131 F. Supp. 2d at 416 (quoting *Nat'l Broad. Co. v. Bear Stearns & Co.,* 165 F.3d 184, 189 (2d Cir.1999)), and a person "cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582 (1960).  New York law requires "an express, unequivocal agreement" by a party to hold it to arbitration, and "absent such an explicit commitment neither party may be compelled to arbitrate." *Cont'l Grp.,* 873 F.2d at 617 (internal citations omitted).

"Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs.,*

*Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). Here, it is unquestioned that RBC did not enter into an arbitration agreement with Phiri.

## I.    Phiri Fails to Overcome the Rule that Non-Signatories to an Arbitration Agreement Cannot Be Bound

While there are limited theories under which a court may be willing to enforce an arbitration agreement against a non-signatory, "[a]nything short of requiring a *full* showing of some accepted theory under agency or contract law imperils a vast number of parent corporations." *Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 780 (2d Cir. 1995) (finding that corporate parent was not bound by subsidiary's arbitration clause under common law theories of assumption, corporate veil piercing, or estoppel or because parent voluntarily became subsidiary's affiliate). The fundamental principle that non-signatories to an arbitration agreement are not required to submit to arbitration can be overcome only "if so dictated by the 'ordinary principles of contract and agency,'" which recognize five theories by which a non-signatory may be bound: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Id*. at 776. Phiri asserts that RBC should be bound to the Arbitral Order under theories of agency, veil-piercing/alter ego, and estoppel. Phiri bears the burden of proof on all his theories, and has satisfied it on none of them.

### A.    Royal Bank of Canada and RBC Capital Markets, LLC Are Not Alter Egos

Phiri asserts in conclusory terms that Royal Bank of Canada and RBC Capital Markets, LLC "should be considered indistinguishable," and as a result RBC should be bound by the agreement to arbitrate between RBCCM and Phiri. Mem. to Bind at 1. However, "[d]isregard of the corporate form is warranted only in 'extraordinary circumstances.'" S*ociete d'Assurance de l'Est SPRL v. Citigroup Inc.*, No. 10 CIV. 4754 JGK, 2011 WL 4056306, at *5 (S.D.N.Y. Sept. 13, 2011). "Veil piercing determinations are fact specific and 'differ[] with the circumstances of

each case." *Thomson,* 64 F.3d at 777 (quoting *Am. Protein Corp. v. AB Volvo,* 844 F.2d 56, 60 (2d Cir. 1988) (finding that evidence of interlocking directorates was a "commonplace circumstance of modern business" that did not furnish such proof of control as would permit the court to pierce the corporate veil)). "Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners." *Id*. "Thus, cursory or conclusory allegations are insufficient to state a prima facie claim of alter ego liability." *Kalin v. Xanboo, Inc.*, No. 04 Civ. 5931 RJS, 2009 WL 928279, at *11 (S.D.N.Y. Mar. 30, 2009) (Sullivan, J.).

As the record reflects, Royal Bank of Canada is a Canadian Chartered Bank headquartered in Toronto, Canada. It is a publicly traded company. RBC Capital Markets, LLC is a Minnesota Limited Liability Company headquartered in New York that is an indirect subsidiary of RBC. RBCCM is a registered U.S. broker-dealer and member of FINRA, and as such, participates in a highly regulated industry subject to FINRA's rules. These include financial and operational rules such as net capital requirements,[8] margin requirements,[9] books, records, and reporting requirements,[10] as well as many other rules. RBCCM receives and pays for certain services from Royal Bank of Canada. Kapusta Decl., ¶ 4 and Ex. C. RBC and RBCCM do not have the same directors. *See* Kapusta Decl. Exs. A and B.

Phiri's allegations regarding the relationship between RBC and RBCCM are "insufficient to carry the 'heavy burden' placed on a party who seeks to pierce the corporate veil." *Kalin,* 2009 WL 928279, at *11. Phiri has failed to satisfy the two part showing required by New York

---

[8] FINRA, Rule 4110 (2010).

[9] FINRA, Rule 4210 (2010).

[10] FINRA Rule 4511 (2011).

law in order to pierce the corporate veil: "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Kalin*, 2009 WL 928279, at *11.

Even complete ownership of a subsidiary's stock is insufficient, by itself, to pierce the corporate veil. "Actual domination, rather than the opportunity to exercise control, must be shown," *Oppenheimer & Co. v. Deutsche Bank AG,* No. 09 Civ. 8154(LAP), 2010 WL 743915, at *4 (S.D.N.Y. Mar. 2, 2010) (citations omitted). "A parent corporation and its subsidiary lose their distinct corporate identities when their conduct demonstrates a virtual abandonment of separateness." *Thomson,* 64 F.3d at 778. Courts consider ten factors in assessing "complete domination," in the context of the transaction. Phiri is unable to establish any of these factors:

> [C]ourts consider many factors in determining whether to pierce the corporate veil, including: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC,* 268 F.3d 58, 63 (2d Cir. 2001) (refusing to pierce the corporate veil and bind parent where parent and sub shared common ownership, parent actually controlled sub, and parent incorporated sub into its own organizational and decision-making structure, where there was no absence of corporate formalities or intermingling of corporate finances and directorship). The burden of proof rests with the party asserting an alter ego relationship. *See Kalin,* 2009 WL 928279, at *100 (party

who seeks to pierce the corporate veil has a "heavy burden").  Phiri cannot show a "virtual

abandonment of separateness" between Royal Bank of Canada and RBC Capital Markets, LLC.

Phiri asserts that the fact that Royal Bank of Canada, a public company, files

consolidated financial statements and that RBCCM and other Capital Markets divisions share

certain business policies make them alter egos.  Mem. to Bind at 3-4.  Setting aside the

vagueness of and deficiencies in Phiri's proof, such assertions are insufficient to pierce the

corporate veil.  Relationships that are far more intertwined have been held not to constitute alter

ego relationships or warranted piercing the corporate veil.  "[C]onsolidated financial reports and

overlapping directors and officers 'are commonplace as generally-accepted corporate form, and

are insufficient, without more, as a matter of law, to eviscerate the presumption of corporate

separateness." *Oppenheimer,* 2010 WL 743915, at *4 (citations omitted).  *See also Fidenas AG*

*v. Honeywell Inc.*, 501 F. Supp. 1029, 1034, 1037 (S.D.N.Y. 1980) (allegations that parent

"included officers and employees of [subsidiary] in [parent's] 'Corporate Executive

Compensation Plan,'" "issued numerous written corporate policies and procedures governing the

conduct of corporate affairs which . . . were . . . applicable to [subsidiary]," and "described

[subsidiary] as a department or division of [parent]" were "insufficient to overcome the

presumption of corporate separateness," "even if they are accepted as true."); *Sarhank Grp. v.*

*Oracle Corp.,* 404 F.3d 657, 662 (2d Cir. 2005) (noting that "the practice of dealing through a

subsidiary is entirely appropriate and essential to our nation's conduct of foreign trade").

Further, while Phiri makes vague assertions regarding an "operating committee" for the

Capital Markets business segment of RBC's business (Mem. to Bind at 3-4 and 18), courts

recognize that even where a parent exercises control over financial and operational policies or

overall risk and capital management supervision—as to which Phiri has not offered evidence, as

opposed to conclusions here—such activities are consistent with an ordinary stockholder-corporation relationship and do not suggest an alter ego relationship. *Sarhank,* 404 F.3d at 662. And while having common directors is not sufficient to pierce the corporate veil, Royal Bank of Canada and RBCCM share no directors. *See* Kapusta Decl. Exs. A and B.

In a display of verbal gamesmanship Phiri alleges that Royal Bank of Canada "controls" RBCCM "as a matter of law and federal banking regulation" because it owns the "financial holding company" which "controls" RBCCM according to 12 C.F.R. 225.2. Mem. to Bind at 5. However, under 12 C.F.R. 225.2, "control" includes having "[o]wnership, control, or power to vote 25 percent or more of the outstanding shares of any class of voting securities of the bank." 12 C.F.R. § 225.2(e)(1)(i). Owning 25% of a bank's stock is far from the "complete domination" required to pierce the corporate veil, *Oppenheimer,* 2010 WL 743915, at *4, and indeed, Phiri's assertion that ownership of a bank holding company necessarily establishes an alter ego relationship would mean that *every* corporate banking parent would be subject to arbitration before FINRA if one of its subsidiaries is a FINRA member. This is not the case. *Cf. McAnaney v. Astoria Fin. Corp.,* 665 F. Supp. 2d 132, 145 (E.D.N.Y. 2009) (finding that evidence that the bank holding company defendants owned controlling interests in subsidiaries, filed consolidated financial returns, and shared common officers and directors with their subsidiaries is "commonplace as generally-accepted corporate form" and insufficient without more "to eviscerate the presumption of corporate separateness."); s*ee also Societe d'Assurance,* 2011 WL 4056306, at *6 (conducting robust alter ego analysis in a breach of contract action and refusing to pierce the corporate veil where "Citibank exercise[d] the degree of control over [subsidiary bank] Citigroup Congo that would be expected of a corporate parent."). *Cf. United Paperworkers Int'l Union v. T. P. Prop. Corp.,* 583 F.2d 33, 35 (1st Cir. 1978) ("Given the …

facts, an order to … arbitrate … could only be based on a policy that a holding parent corporation should be bound to the arbitration agreement of its subsidiary whenever it controls its subsidiary's stock and participates in its management.  No such policy has yet been adopted by Congress or the courts.").

Phiri's cursory assertion that "RBCCM's sole purpose is to serve Royal Bank as part of its integrated business" (Mem. to Bind at 19) does not establish an alter ego relationship or pierce the corporate veil as a matter of law.  *See, e.g., Ayco v. Becker,* 2011 WL 3651027, at *5 (refusing to compel 99% owner and affiliate of FINRA member to arbitrate based on "conclusory" allegations that affiliate controlled subsidiary and that subsidiary was undercapitalized); *Ayco Co. L.P. v. Frisch,* No. 1:11-CV-580 (LEK/DRH), 2012 WL 42134, at *8 (N.D.N.Y. Jan. 9, 2012) (refusing to compel 99% owner and affiliate of FINRA member to arbitrate where claimant alleged that member was "just a facility operated by [affiliate's] employees, used to serve [affiliate's needs]"; subsidiary was undercapitalized, there was overlap between affiliate and member's corporate structure and among their executive officers and management, and affiliate and member shared the same listed address and telephone number).

Nor do Phiri's allegations that Royal Bank of Canada permits its subsidiaries to operate using the RBC brand,[11] and allows several subsidiaries to use its "Capital Markets" trademark under license establish an alter ego relationship or warrant piercing the corporate veil.  *See Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.,* 337 F.3d 125, 130 (2d Cir. 2003) (refusing to bind non-signatory to arbitration, finding corporate, brokerage and marketing relationships between signatory and non-signatory, assertion that signatory and non-signatory "present[ed] to the public the image of a single, integrated firm," and assertion that non-signatory to arbitration agreement

---

[11] An allegation made without support or explanation.

controlled party insufficient); *Societe d'Assurance*, 2011 WL 4056306, at *6 (finding no alter

ego relationship between Citibank and Citibank Congo); *O'Donnell v. Club Mediterranee S.A.*,

No. 05-CV-610 (ARR), 2008 WL 794975, at *11 (E.D.N.Y. Mar. 24, 2008) (declining to pierce

the corporate veil and stating "that the entities use the same name and logo and annually report

their operations as a consolidated group, are common in corporate conglomerate structures such

as that of the Club Med entities, and simply establish commonality in the resources and goals of

the Club Med entities, but do not demonstrate control or domination of one entity over the

other.").

   Finally, Phiri asserts that Royal Bank of Canada controls RBCCM because "Royal Bank

did not allow RBC CM to raise a lack of ownership defense" and "Royal Bank directed an

ongoing concealment."  Mem. to Bind at 5.  Again, Phiri's counsel makes baseless accusations

without support.  Nowhere in the cited transcript sections is there any reference to what RBCCM

was "allowed" to do, or that RBC "directed" any "concealment."  What is true is that RBCCM

was not required to submit RBC's rights to the panel for determination.

   As Royal Bank of Canada did not exercise the complete domination over RBCCM

required to pierce the corporate veil, Phiri cannot establish even the first prong of an alter ego

theory.  Since Phiri fails to establish the required domination as a matter of law, RBC is not

required to reach the second element required, that such domination was used to commit a fraud

or wrong against the plaintiff which resulted in plaintiff's injury.  However, Phiri fails to satisfy

this element as well.  While he makes the inflammatory, but completely unsupported assertion

that RBC "used its different subsidiaries to avoid application of the Volcker Rule," (Mem. to

Bind at 18), Phiri fails to explain how conducting business to comply with the Volcker Rule

constitutes fraud or any other wrong.  He likewise fails to allege or show that such action injured

Phiri.  Further, while Phiri asserts that RBC attempts to "defeat the legislative goals of the Federal Arbitration Act," (*id.*) the FAA only requires that parties to a "written agreement for arbitration" arbitrate, and provides that disputes over the existence of such an agreement be resolved by the courts.  9 U.S.C. § 4.

### B.    RBC Cannot Be Bound to the Order Based on Agency Principles

Phiri asserts that RBCCM was RBC's agent sufficient to subject it to arbitration because the Information Schedule to the Services Agreement authorizes RBCCM to "'act as agent' for Royal Bank for this business."  Mem. to Bind at 10.  This assertion is wrong both factually and legally.  The Information Schedule lists specific tasks in which RBCCM is allowed to act on behalf of RBC  and provides that "[t]he Parties agree that [RBCCM] shall act as an agent for [RBC] for *only* those transactions specified in this Information Schedule."  Brown Decl., Ex. 5 at 4) (emphasis added).  The Schedule did not authorize RBCCM to act as RBC's agent to submit it to arbitration.  The fact that an entity is an agent for some purposes does not make it a general agent for all others.  *Amedeo Hotels Ltd. P'ship v. N.Y. Hotel & Motel Trades Council*, AFL-CIO, No. 10 CIV. 6150 NRB, 2011 WL 2016002, at *8 (S.D.N.Y. May 18, 2011) (vacating arbitration award where it purported to bind nonsignatory under an agency theory where an entity was an agent for some purposes but not others, stating, "[a]s a consequence of the arbitrator's failure to appreciate the agency relationships, he issued an award that is directed to a non-party to the agreement which is the genesis of the arbitrator's authority.  As such, it is *ultra vires* and unenforceable.").

Nor does the fact that RBCCM is a FINRA member make RBCCM the agent of RBC for purposes of submitting RBC to arbitration before FINRA. Courts have consistently rejected this theory, which would subject all parent organizations of FINRA members to arbitration before FINRA.  *See, e.g., Ayco v. Becker*, 2011 WL 3651027, at *7 (rejecting argument that plaintiff

15

had an agency relationship with related entity by virtue of their affiliate relationship and holding

that plaintiff could not be bound to arbitrate before FINRA on the basis of a Form U-4

Agreement that defendant executed with plaintiff's affiliate); *Ayco v. Frisch*, 2012 WL 42134, at

\*7 (same); *Merrill Lynch Inv. Managers*, 337 F.3d at 130 (rejecting the argument that affiliated

entities were each other's agents for purposes of binding non-signatory to arbitrate before the

New York Stock Exchange because they were commonly controlled and noting that "mutual

benefits derived from affiliation ... [are] insufficient to bind a non-signatory on agency principles

to an arbitration agreement signed by an affiliate.").[12]

### C.    RBC Is Not Bound to the Arbitral Order Under Direct Benefit Estoppel

Unable to meet the standards for agency or alter ego, Phiri asserts that RBC should be

bound to the Arbitral Order by direct benefit estoppel, asserting that "Royal Bank directly

benefitted from Phiri's use of the SAIP for RBC CM" and "[t]hat alone is grounds for estoppel

and binding Royal Bank to the Arbitration Order." Mem. to Bind at 2.   Similarly Phiri asserts

that RBC benefits from RBCCM's FINRA listing.  These assertions do not satisfy the test for

direct benefit estoppel.

"Direct benefit estoppel" applies only where the party "'knowingly accepted the benefits

of an agreement with an arbitration clause.'" *Oppenheimer*, 2010 WL 743915, at \*2.  "The

benefits must be direct--which is to say, flowing directly from the agreement." *Id.*  "The mere

fact of a [nonsignatory's] affiliation with a signatory will not suffice to estop the nonsignatory

from avoiding arbitration, no matter how close the affiliation is." *Id.*  "An indirect benefit

---

[12] Phiri's argument that RBC is bound by the arbitration because a lawyer employed by RBC appeared at the arbitration hearing and represented RBCCM is equally unavailing.  RBC provides legal services to RBCCM under services agreements under which RBCCM pays its share of the "fully loaded" cost.  Kapusta Decl. Ex. C. The fact that a lawyer employed by RBC performed legal services for RBCCM under a contract requiring RBCCM to pay for his services does not make RBCCM the agent of RBC binding it to the Arbitral Order.

flowing from the agreement, where the 'nonsignatory exploits the contractual relation of the parties to an agreement but does not exploit (and thereby assume) the agreement itself,' is not a sufficient basis for estopping a nonsignatory from avoiding arbitration." *Schaad v. Susquehanna Capital Grp.*, No. 03 Civ. 9902(LTS)(DFE), 2004 WL 1794481, at *5 (S.D.N.Y. Aug. 10, 2004) (citing *Thomson,* 64 F.3d at 779).

Phiri asserts that RBC would have been required to arbitrate because it received a direct benefit from RBCCM's FINRA membership in the form of RBCCM's ability to trade securities in the United States and generate profits. Mem. to Bind at 8-9. However, the law is clear that a parent corporation derives only an indirect benefit from its subsidiary's membership in FINRA, and that that benefit flows from the relationship, rather than from the agreement containing the arbitration provision. The parent, therefore, cannot be required to arbitrate on this basis. Were the law otherwise, every parent of a FINRA member would always be required to arbitrate before FINRA when asked to do so by a FINRA member or associated person. That is not the law.[13]

Phiri also alleges that RBC "obviously benefitted from Phiri's work." Mem. to Bind at 14. That alleged benefit did not directly flow from an agreement to arbitrate—the only relevant

---

[13] *See, e.g., Oppenheimer,* 2010 WL 743915, at *3-4 (finding no direct benefit estoppel where, while parent company gained financially as a result of its subsidiary's FINRA membership and benefitted as parent by taking advantage of subsidiary's broker-dealer relationships with clients, this fact did not establish a direct benefit from the arbitration agreement); *Ayco v. Frisch,* 2012 WL 42134, at *10 (finding no direct benefit estoppel binding 99% owner and affiliate of FINRA member to arbitrate since while affiliate may have benefitted from defendant employees' obtaining securities licenses with subsidiary, defendants "ha[ve] failed to sufficiently establish that this benefit flowed directly from the Form U-4 Agreement (and in particular its arbitration clause)" (internal quotations and citation omitted); *Ayco v. Becker,* 2011 WL 3651027, at *5 (same); *Phoenix Cos. Inc. v. Abrahamsen,* No. 05 Civ. 4894 (WHP), 2006 WL 2847812 (S.D.N.Y. Sept. 28, 2006) (finding no direct benefit estoppel binding parent to arbitrate before NASD where, while parent derived benefits from the relationship with certain financial advisors, it had no involvement in the execution or performance of the agreements containing the arbitration provision).

inquiry. *See Thomson,* 64 F.3d at 779 (finding benefit necessarily indirect where the buyer company benefitted not from agreement itself, but rather from contractual relationship between its competitor and the purchased company); *Schaad,* 2004 WL 1794481, at *5 (finding no direct benefit estoppel where Petitioner failed to demonstrate any nexus between the alleged benefit and the agreement containing the arbitration provision).  The cases relied upon by Phiri are distinguishable in that, unlike here, the non-signatories derived some direct benefit from a contract which itself contained an arbitration provision or which was directly predicated upon a related agreement containing an arbitration provision. [14]

## II.    RBC Is Not Estopped From Asserting Its Ownership of the Intellectual Property

Phiri asserts that RBC should be estopped from asserting its ownership rights over the intellectual property or that the panel exceeded its powers in awarding property that belongs to a non-party to the arbitration because RBC did not explicitly notify Phiri of its ownership of the intellectual property while Phiri was arbitrating with RBCCM.[15]   However no principles of estoppel apply.

---

[14] *See, e.g., Alfa Laval U.S. Treasury Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 857 F. Supp. 2d 404, 414 (S.D.N.Y. 2012) (indemnity agreements containing arbitration clause were source of union's obligation to issue insurance policies through which non-signatories obtained insurance coverage); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir. 1999) (agreement containing arbitration provision directly conferred benefits on the nonsignatory including (1) significantly lower insurance rates for the vessel; and (2) ability to register vessel under the French flag, which "would have been practically impossible" without the agreement); *Life Techs Corp. v. AB Sciex Pte. Ltd.,* 803 F. Supp. 2d 270, 277-79 (S.D.N.Y. 2011) (direct benefit flowed from purchase agreement containing arbitration clause to non-signatory trademark licensees where purchase agreement explicitly contemplated license of trademarks to affiliates and the license agreements signed by the trademark licensees explicitly referenced purchase agreement); *McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.,* 14-cv-6633, 14-cv-6675 (KBF), 2015 U.S. Dist. LEXIS 3347 (S.D.N.Y. Jan. 12, 2015) (agreement containing arbitration clause was a condition precedent to a loan from which non-party directly profited and benefit was specifically contemplated).

[15] In his brief, Phiri asserts that "[d]uring the arbitration, the RBC Entities' joint counsel argued in summation that 'no one would make a deal' to transfer 'intellectual property worth $50

**A.    RBC is not judicially estopped because it took no position in the state court proceeding**

Judicial estoppel only applies where "(1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner." *United States v. Hussein*, 178 F.3d 125, 130 (2d Cir. 1999). RBC did not appear before the state court or before the arbitration panel and asserted no position (nor did the state court adopt any position) regarding the ownership of intellectual property Phiri seeks. It is not judicially estopped from now asserting its rights.[16]

**B.    RBC is not equitably estopped because it made no false representation upon which Phiri relied to his detriment**

Equitable estoppel is similarly inapplicable here.[17] As an initial matter, "'[e]quitable estoppel is an extraordinary remedy' . . . that 'should be invoked sparingly and only under

---

million of revenue a year.'" Mem. to Bind at 10. Again, Phiri makes misrepresentations to the Court. Referencing the transcript section cited, what counsel *for RBCCM* actually said, in response to an argument from Phiri that he was entitled to intellectual property unless the Volcker rule was repealed, is that "no one would make a deal" to "grant rights to an intellectual property worth $50 million of revenue a year based on someone's guess as to whether the United States government is going to [repeal the law] in 18 months." Arb. Tr. 1138:3-1139:14. Further, the settlement agreement with another employee to which Phiri points expressly does not assign ownership of intellectual property and simply grants the employee non-exclusive rights with respect to "RBC Code." Cohen Dec. Ex. J. at Paragraph 5(a) and (b). The employee further represents, Paragraph 7, that he does not possess any copies of the RBC Code.

[16] As discussed in the Shea Declaration dated April 18, 2017 (dkt. No. 36), which RBC today adopts, the misstatement by RBCCM was a mistake never adopted by the state court, making judicial estoppel inapplicable on this ground as well.

[17] While Phiri asserts in his brief that RBC should be collaterally estopped, (Mem. to Bind at 15-16), he cites cases regarding equitable estoppel. Regardless, collateral estoppel also does not apply, as it requires that "the issue in the prior proceeding was actually litigated and actually decided." *Hussein*, 178 F.3d at 129. RBC did not litigate its ownership of the intellectual property before either the state court or the arbitration panel, and neither rendered any decision regarding ownership.

19

exceptional circumstances.'" *Cohen Lans LLP v. Naseman*, No. 14-CV-4045 (JPO), 2017 WL 477775, at *8 (S.D.N.Y. Feb. 3, 2017) (internal citations omitted); *see Nasso v. Bio Reference Labs., Inc.,* 892 F. Supp. 2d 439, 449 (E.D.N.Y. 2012).  Equitable estoppel requires that the party to be estopped must have "(1) [engaged in] conduct which amounts to a false representation or concealment of material facts; (2) inten[ded] that such conduct [would] be acted upon by the other party; and (3) [knew] the real facts."  *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir. 1996) (quoting *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.,* 76 A.D.2d 68, 81, 430 N.Y.S.2d 179, 187 (4th Dep't 1980)).  The party asserting the defense, on the other hand, must show that it (1) lacked knowledge of the true facts; (2) relied upon the conduct of the other party; and (3) changed its position to its detriment.  *Id.*  Phiri fails to satisfy these elements.

### 1.    RBC made no false representations and did not violate a legal duty to speak

First, RBC made no false representations and did not conceal material facts.  Phiri apparently points to RBC's failure to raise the issue of its ownership at an earlier date.  However, "[e]quitable estoppel requires active concealment or misrepresentation; it is insufficient to merely allege that the party to be estopped remained silent."  *Cohen Lans LLP v. Naseman*, No. 14-CV-4045 (JPO), 2017 WL 477775, at *9 (S.D.N.Y. Feb. 3, 2017).  "A party against whom a claim exists is not, without more, under a duty to inform the injured party thereof, and such failure to inform does not constitute the kind of fraudulent concealment which gives rise to an estoppel."  *Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 445 (S.D.N.Y. 2006).  RBC was under no legal duty to inform Phiri of its ownership of the intellectual property.  Nor did it have a duty to correct an immaterial misstatement made by another in the early hours of a litigation to which

it was not a party. RBC's silence cannot constitute the misrepresentation required for the application of equitable estoppel.

*Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 726 (2d Cir. 2001), liberally cited by Phiri, is completely inapplicable. The court in *Kosakow* found that when an employer failed to provide an employee with notice of her FMLA eligibility as required by statute, the employer's "silence in the face of its legal duty to inform [the employee] of her ineligibility is properly construed as an affirmative misrepresentation," which estopped the employer from later asserting that employee's leave was not entitled to FMLA protections. *Id.* at 725–26 (further determining as a factual matter that, had the employee received the statutorily required notice, she would have taken alternate action).

Phiri argues that a failure to object to the arbitration proceeding constitutes a waiver of RBC's right to object to the arbitration award. The cases he relies on, however, involve *parties to the arbitration proceeding*[18] or non-signatories to an arbitration agreement who had *actively participated* in the arbitration proceeding and thereby waived the right to a day in court—precisely the opposite of what occurred here.[19]

Finally, Phiri cites a number of additional cases purportedly in support of his estoppel argument that RBC "should not be permitted a second bite of the apple" because it did not participate in, or move to stay,[20] the arbitration proceedings.[21] Mem. to Bind at 12-13. These

---

[18] *Cook Indus., Inc. v. C. Itoh & Co. (Am.), Inc.,* 405 U.S. 921 (1972); *Nat'l Wrecking Co. v. Int'l Bd. Of Teamsters, Local 731,* 957 F.2d 990, 960-61 (7th Cir. 1993); *United Steelworkers of Am., AFL-CIO-CLC v. Smoke-Craft, Inc.,* 652 F.2d 1356, 1360 (9th Cir. 1981).

[19] *See, e.g., Slaney v. The Int'l Amateur Athletic Fed'n,* 244 F.3d 580, 591 (7th Cir. 2001) (having participated in arbitration proceeding, non-signatory lost the right to challenge adverse award in judicial proceeding on ground that she had never agreed to arbitrate).

[20] To the extent Phiri asserts RBC should have sought to stay the arbitration, not only did RBC not have a duty to do so, as a non-party to the arbitration, it lacked the required standing to do so.

cases establish no such thing.  A party does not receive "two bites at the apple" by refusing to participate in an arbitration to which it did not consent—it has its rights determined in the forum in which it agreed tht its claims would be heard.  Where claims with some parties are subject to arbitration and others are not, "second bites," or involvement by more than one forum, are inevitable, as the disputes must proceed in arbitration and court respectively, "even when the result would be the possibly inefficient maintenance of separate proceedings in different forums."  *See, e.g.*, *Dean Witter*, 470 U.S. at 213; *NPS Commc'ns, Inc.* 873 F.2d at 466; *Chartis Seguros*, 967 F. Supp. 2d at 765; *Morgan, Olmstead*, 608 F. Supp. at 1568-1569.

### 2.    Phiri had knowledge of the facts

Phiri cannot establish that he relied on any misstatement or omission of RBC.  Phiri's arbitration testimony shows his awareness that RBCCM did not own the intellectual property he sought.  Arb. Tr. 582:17-583:18 (testifying that he knew that RBC owned the file servers containing the "quant trading intellectual property," that RBCCM employees "have access" to

---

*See Cantor Fitzgerald Partners v. Mun. Partners, LLC*, 11 A.D.3d 247, 247-48, 782 N.Y.S.2d 434, 435 (1st Dep't 2004) (where non-party eSpeed sought stay prior to arbitration, holding "[w]hether the arbitrators will exceed their authority with regard to eSpeed, which was not made a party to this arbitration and thus has no standing to seek a stay, is purely speculative at this point."); *Amedeo Hotels*, 2011 WL 2016002, at *6 ("[I]t is hard to imagine that a court would have granted a motion to stay arbitration based on the fact that part of the requested relief was beyond the scope of the arbitrator's authority.  Such a motion would have sought a ruling on an issue that had not and might never ripen into an actual controversy. . . .  We cannot hold that since the Palace did not bring a meritless motion to stay the arbitration, it is unable to challenge the award granted by the arbitrator as one exceeding the scope of his authority.)  (Citations omitted).

[21] While Phiri's counsel asserts that RBC "feared having to litigate" whether it was required to arbitrate claims with Phiri (Mem. to Bind at 7), this is not the truth.  As actually stated in the transcript Phiri's counsel cites, RBC was entitled to protect its right to litigate in court any issue of whether it could be could be bound to arbitrate.  If RBC had intervened in the arbitration, it could have been held to have waived that right by voluntarily submitting itself to the jurisdiction of the panel.  *See N.Y. Hotel & Motel Trades Council, AFL-CIO v. Hotel Nikko of N.Y., Inc.*, Nos. 91 Civ. 0795 (DNE), 91 Civ. 0755 (DNE), 1991 WL 168284, at *5 (S.D.N.Y. Aug. 22, 1991).

them and that he did not know "how RBC says who specifically owns them, how it's licensed"). Further, in Phiri's own Statement of Claim, he alleged that his claims were based on promises by non-parties that Phiri would be afforded intellectual property.[22]   Throughout the arbitration, RBCCM argued that Phiri had brought his action against the wrong party.[23]   Despite this knowledge, Phiri chose not to pursue claims against any of these non-FINRA members, which would have required pursuing claims in court.  Instead, Phiri chose to only pursue claims in an expedited FINRA arbitration where his adversary would be stripped of most procedural protections courts provide, and, instead of attempting to compel other parties to join that expedited arbitration, urged the panel to determine their rights in their absence.  The fact that a court is now involved should come as no surprise.

### 3.      Phiri cannot establish detrimental reliance

Phiri fails to establish "unconscionable injury" necessary to warrant the extraordinary remedy of equitable estoppel.  *Am. Bartenders Sch., Inc. v. 105 Madison Co.*, 59 N.Y.2d 716, 718, 463 N.Y.S.2d 424, 424 (1983).  Phiri alleges that he was denied the opportunity to "(i) attempt to implead Royal Bank into the arbitration; (ii) sue for a judicial determination that Royal Bank is obligated to arbitrate based on the direct benefit it receives from RBC CM's FINRA listing; (iii) seek alternative damages; or (iv) simultaneously sue Royal Bank in court while the arbitration proceeded."  Mem. to Bind at 16.  RBC did not deprive Phiri of any of these rights.  Phiri elected not to pursue some of them prior to the arbitration but continues to vigorously assert the same arguments underlying those options before this Court and to press options (ii) before this Court and (iii) in the ongoing arbitration now.

---

[22] *See* n.3, *supra.*

[23] Arb. Tr. 160:3-4, 1162:16-18.

Had Phiri lost in the arbitration, he would have been able to attempt to pursue claims against the non-parties in court.  Having prevailed in the arbitration, Phiri is now in the same position to make the same arguments he could have made in court at the outset of the dispute to this Court as he attempts to bind RBC to the Arbitral Order.  Phiri is also free to pursue damage claims against RBCCM in the arbitration and to pursue claims against RBC in this case.  The "decision not to pursue legal action at an earlier date is not an "unconscionable injury" as required to invoke equitable estoppel.  *Nasso*, 892 F. Supp. 2d at 450.

## CONCLUSION

Phiri's cross-motion seeks to bind a non-party to the results of an arbitration to which it did not agree to submit its rights.  RBC was not bound to submit its rights to be determined in arbitration and did not do so.  Nor was Phiri required to move to compel RBC to arbitrate.  The fact that various participants to the dispute made different choices about where it would be resolved means that the dispute must necessarily be addressed in two forums.  As the court found in *Promotora*, 131 F. Supp. 2d at 421, amidst assertions of strategic choices and attempts at second bites at the apple, "the showing that is required on a motion to confirm an award is a *clear and unambiguous* intent on the part of [the party] to arbitrate."  As in *Promotora*, that cannot be demonstrated on this record.  RBC did not agree to arbitrate and should not be bound to the results of the arbitration under contractual or other theories.[24]

---

[24] In support of this memorandum, RBC files under seal Exhibit C to the Kapusta Declaration, and Exhibits 4 and 5 to the Brown Declaration.  The reasons for filing Exhibits 4 and 5 under seal have previously been presented.  *See* April 18, 2017 Memorandum of Law in Support of Petition to Vacate and in Opposition to Phiri's Petition to Confirm Award ("Mem. to Vacate") at 27-28, Brown Declaration dated April 18, 2017 ¶ 10.  For the same reasons set forth in the Mem. to Vacate at 27-28, and on the basis of the Declaration of Pablo Kapusta ¶ 4, Exhibit C to the Kapusta Declaration should also be permitted to be filed under seal.

Dated:      New York, New York
              April 25, 2017

PAUL HASTINGS LLP

   /s/ Patrick W. Shea
By:    Patrick W. Shea
200 Park Avenue
New York, New York 10166
(212) 318-6000
patrickshea@paulhastings.com

Counsel for Defendants RBC Capital Markets, LLC
and Royal Bank of Canada